Curtis MOSLEY, Plaintiff,

v.

The NATIONAL MARITIME UNION PENSION & WELFARE PLAN, Defendant.

No. 74 C 616.

United States District Court,
E. D. New York.

Sept. 7, 1977.

Jack A. Kaplowitz, Mineola, N. Y., for plaintiff.

Phillips & Cappiello, New York City, for defendant.

MISHLER, Chief Judge.

In July 1969, Curtis Mosley, aged 61 and in failing health, made his last voyage as a merchant seaman. His retirement ended a career as a seaman that began in 1934. On April 8, 1970, he applied to the National Maritime Union Pension & Welfare Plan (the Plan) for a retirement pension. His application for retirement benefits was denied, and he began this action against the Plan, its administrators and its trustees, pursuant to § 302(c)(5) of the Labor Management Relations Act (Taft-Hartley), 29 U.S.C. § 186(c)(5). Jurisdiction is based on 29 U.S.C. § 186(e) and 28 U.S.C. § 1331. The plaintiff seeks to have declared unlawful the determination of the Plan denying him retirement benefits and requests injunctive relief and damages. Both sides, in agreement as to the essential facts, move for summary judgment.

The Plan is a jointly-administered pension trust[1] that is financed by employer contributions pursuant to a collective bargaining agreement. The Plan was estab-

---

1. The Plan, established pursuant to § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), is administered by six representatives of the National Maritime Union and six employer representatives.

lished in 1951, but employer contributions were not begun until 1953. Since many NMU seamen covered by the Plan had worked substantial periods prior to the creation of the pension fund, a formula was developed to credit these seamen with their pre-Plan service yet avoid burdening the pension fund with payments to seamen whose working years, coming to an end, had not generated payments to the Plan. Thus, 1951 became the critical year for crediting pre-Plan service towards a pension, and several rules for obtaining pre-Plan pension credit, keyed to the year 1951, were established.

First, at its inception the Plan required that in order to obtain pension credit for work in the years prior to 1951, a seaman must have worked in covered employment for at least 200 days during any period of three consecutive years, beginning January 1, 1953. Under this rule as originally enacted, for example, a seaman could work 67 days a year in the three-year period 1953–55 without incurring a "Break in Service." A single break in service, however, cancelled out the seaman's entire pre-1951 service for pension crediting purposes. Second, as originally devised, the Plan required that, to receive credit for "past" service, an employee must work 200 days in covered employment between 1951 and 1953. Finally, of course, the Plan established the basic age and service requirements for qualifying for one of the several pension plans available to NMU seamen. One type of plan, the "Early Retirement Pension," entitled a seaman to retire once he attained the age of 60 and, if his pension would be paid after 1959, once he had accumulated 15 years of pension credit.

It was apparently the Early Retirement Pension that interested the plaintiff. Prior to 1951, the plaintiff had earned 6 and ¼ years of past service credit. Between 1951 and 1969, he acquired 8 and ¾ years of future service credit, making a total of 15 years of past and future credit. Under the break rule, in which the requirement of minimum covered employment did not begin until 1953, the plaintiff avoided a break in service. Additionally, he met the re-

quirement of working 200 days in covered employment between 1951 and 1953. Had the regulations in effect for nearly all of the plaintiff's career remained unchanged, the plaintiff would currently be receiving an early retirement pension.

In the late 1960's, however, changes were made in the eligibility requirements. Effective January 1, 1970, the break rule was amended to require that, beginning in 1951, instead of 1953, a seaman must have worked not less than 200 days in any three consecutive years, or he would incur a break in service. Although the plaintiff had worked 200 days between 1951 and 1953, and he had worked 200 days in every three year period after 1953, he had not worked 200 days in the three year period 1952–54. Thus, under the new rule, he incurred a break in service which wiped out his pre-1951 service for pension purposes.

On April 17, 1968, a requirement was added, effective January 1, 1969, that a seaman seeking credit for pre-1951 work must, "on and after January 1, 1951, [earn] at least (10) years of credit." Credits are calculated on the basis of days of covered employment worked in the calendar year. Two hundred days worked in a calendar year counts as one full year's credit; 150–199 days, as ¾ of a year's credit; 100–149 days, as ½ a year's credit; 50–99 days, as ¼ of a year's credit; and less than 50 days in a calendar year earns no credit. Thus, the bare minimum of days to accumulate 10 years of post-1951, or "future" service, and thereby obtain credit for pre-1951, or "past" service, is 2,000. At his retirement, however, the plaintiff was 1 and ¼ credits short of the post-1951 requirement of 10 years of credit, now a prerequisite to aggregating his pre-1951 service towards a pension.

On April 17, 1968, the same day the ten year rule was enacted, the Trustees amended the early retirement plan to require that all conditions to qualifying for such a pension must be met by January 1, 1969. If a seaman did not reach the age of 60 by January 1, 1969, or did not put together 15 years of credit until after that date, he

would be unable to obtain an early retirement pension. The plaintiff did not accumulate his 15 years of pension credit, pre- and post-1951, until seven months later, in July 1969, the month of his final voyage. The Trustees ruled that he was ineligible for the early retirement plan.

## I.

Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, prohibits employers and their representatives from making payments of money "or other thing of value" to employee representatives, i. e., unions, and makes it illegal for unions to demand such payments.[2] An important exception to this general prohibition was made for payments to an employee welfare or pension fund. Section 302(c)(5) provides that the provisions of § 302 are not applicable.

> with respect to money or other thing of value paid to a trust fund established by such representative, for the *sole and exclusive benefit of the employees of such employer,* and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)

29 U.S.C. § 186(c)(5) (emphasis supplied). Under § 302(e), 29 U.S.C. § 186(e), federal district courts have jurisdiction "to restrain violations of this section."

---

**2.** Sections 302(a) and (b) of the Labor Management Relations Act, provide in part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce;

. . . . .

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

Section 302(c) provides in part:

(c) The provisions of this section shall not be applicable

. . . . .

(5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; * * *.

29 U.S.C. § 186(a)–(c).

Although the general objective of Congress in enacting § 302 was to eliminate the corruption generated by employer payments to unions, see 92 Cong.Rec. 5180–81 and 5345 (1946); 93 Cong.Rec. 4746–47 (1947),[3] the pension plan exception of § 302(c)(5) has been the basis for a multitude of challenges to the denial of pension benefits.[4] There is, however, disagreement as to the meaning of the "sole and exclusive benefit" language of § 302(c)(5) and the scope of its substantive requirements. Preminger & Clancy, *Aspects Of Federal Jurisdiction Under Sections 302(c)(5) And 302(e) Of The Taft-Hartley Act—The "Sole And Exclusive Benefit" Requirement,* 4 Texas So.L.Rev. 1 (1976). Nonetheless, a majority of courts agree that for jurisdictional purposes a distinction exists between

> actions involving "structural" deficiencies in the relevant trust which cause it to violate the "sole and exclusive benefit" provision of § 302(c)(5) and actions involving only questions of day-to-day fiduciary administration of welfare and pension funds.

*Alvares v. Erickson,* 514 F.2d 156, 165 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975). *See Lugo v. Employees Retirement Fund of the Illumina-*tion Products Industry, 529 F.2d 251, 254–55 (2d Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *Bowers v. Ulpiano Casal, Inc.,* 393 F.2d 421, 425 (1st Cir. 1968). Challenges to structural deficiencies in a pension plan, as opposed to an individual claim of misadministration, are within the jurisdiction of federal courts. Of course, there are varying views as to when a plan violates § 302 by failing to be for the sole and exclusive benefit of the employees, and is therefore structurally deficient. In *Bowers v. Ulpiano, supra,* the First Circuit ruled that to violate § 302, a structural defect must be the result of conduct which is "made a crime by section 302," *id.,* implying that allegations of criminal intent or willfulness are a prerequisite to jurisdiction under § 302(e). *See* Preminger & Clancy, *supra* at 5–6 and n. 29–32.

In *Alvares v. Erickson, supra,* the Ninth Circuit, without mentioning the *Bowers* requirement of § 302 criminal conduct, adopted the position that jurisdiction exists if the complaint alleges that trustees acting under the authority of the fund, arbitrarily and capriciously denied pensions to employees. In such a case, the fund allegedly is not applied for the sole and exclusive benefit of all employees and is, therefore, structurally

---

3. In *Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), the Court outlined the general purposes of § 302:

> Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. Congressional attention was focussed [sic] particularly upon the latter problem because of the demands which had then recently been made by a large international union for the establishment of a welfare fund to be financed by employers' contributions and administered exclusively by union officials. See *United States v. Ryan,* 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335.
>
> Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. See 92 Cong. Rec. 4892–

4894, 4899, 5181, 5345–5346; S. Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong. Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established. See Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 274, 290. Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e).

*Id.* at 425–26, 79 S.Ct. at 868–69.

4. In addition to the other cases cited in this opinion, see *Lee v. Nesbitt,* 453 F.2d 1309 (9th Cir. 1972); *Insley v. Joyce,* 330 F.Supp. 1228 (N.D.Ill.1971); *Porter v. Teamsters Fund,* 321 F.Supp. 101 (E.D.Pa.1970); *Giordani v. Hoffman,* 295 F.Supp. 463 (E.D.Pa.1969); *Bath v. Pixler,* 283 F.Supp. 632 (D.Colo.1968); *Raymond v. Hoffmann,* 284 F.Supp. 596 (E.D.Pa. 1966).

deficient. *Accord, Burroughs v. Board of Trustees of Pension Trust Fund for Operating Engineers,* 542 F.2d 1128, 1131 (9th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Johnson v. Botica,* 537 F.2d 930, 934 (7th Cir. 1976).

In this circuit, the most recent case involving § 302 is *Lugo v. Employees Retirement Fund, supra.* There, an electrical worker challenged, *inter alia,* minimum work requirement provisions of his pension plan, claiming that the denial of a pension because of his failure to work 90 months in the ten years prior to his pension application was arbitrary and unreasonable. The court held that § 302 jurisdiction exists if the plaintiff alleges that a pension fund is not for the sole and exclusive benefit of the employees because of exclusive eligibility requirements. *Id.,* at 255–56. The *Lugo* court found it unnecessary, however, to define the substantive requirement of § 302(c)(5), since, in its view, the claim was not ripe for adjudication. *See Cuff v. Gleason,* 515 F.2d 127 (2d Cir. 1975); *Beam v. International Organization of Masters, Mates and Pilots,* 511 F.2d 975, 978–79 (2d Cir. 1975); *Moglia v. Geoghegan,* 267 F.Supp. 641 (S.D.N.Y.1967), *aff'd,* 403 F.2d 110 (2d Cir. 1968), *cert. denied,* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969).

■ In this case, the plaintiff challenges specific provisions of the pension fund—the break rule and the ten year requirement—as arbitrary and capricious. He presents a non-frivolous claim that the pension plan fails to meet the "sole and exclusive benefit" requirement of § 302(c)(5). These allegations, despite the possibility that they

may "fail to state a cause of action on which the court can grant relief," *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), are sufficient to give this court jurisdiction under § 302(e).

## II.

The more difficult issue is the proper interpretation of the substantive requirements of § 302(c)(5). There is some doubt that § 302(c)(5) is the source of a "federal common law governing the management of pension plans." *Lugo, supra,* at 255. The Second Circuit in *Lugo* observed that

> The length and detail of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., indicate that the regulation of pension funds with regard to such matters as vesting and procedural rights is a complex task more appropriate for Congress than for the courts. The careful attention paid by Congress in that recently enacted statute to the problem of effective dates and coverage makes us hesitate to conclude that the courts have long been authorized, via the fifth exception to a criminal statute, see note 1, supra, to create obligations similar to those of ERISA.

*Id.* at 255.

■ At the very least, however, § 302(c)(5) requires that the trustees of a plan avoid arbitrary and capricious rules excluding employees from pension rights. *Beam, supra,* at 980; *Johnson v. Botica, supra* at 935. The trustees have a fiduciary duty, co-extensive with the requirements of § 302,[5] both to preserve the financial securi-

---

5. The plaintiff asserts a pendent state claim based on New York law governing the fiduciary obligations of pension fund trustees. *See Haley v. Palatnick,* 378 F.Supp. 499, 503 (S.D. N.Y.1974). In *Mitzner v. Jarcho,* 50 A.D.2d 900, 901, 377 N.Y.S.2d 548, 549 (2d Dep't 1975), for example, the court observed that "[w]hile trustees of pension funds are accorded wide latitude in revising eligibility for pension benefits, they nevertheless owe a fiduciary duty to employees not to impose unreasonable conditions." The fiduciary duty raised by *Mitzner v. Jarcho,* however, appears to be indistinguishable from the obligation imposed on trustees by § 302(c)(5). In this circuit, in considering a

§ 302 challenge to the denial of pension benefits, a court must apply "traditional trust law," involving a determination of whether "the trustees' decision was arbitrary or capricious, the product of bad faith, and whether or not such decision was based on substantial evidence." *Beam v. International Organization of Masters, supra,* at 979–80, *citing inter alia Gitelson v. Du Pont,* 17 N.Y.2d 46, 49, 268 N.Y.S.2d 11, 13, 215 N.E.2d 336 (1966) (burden on claimant to show that the retirement fund's ruling "was motivated by bad faith, or arrived at by fraud or arbitrary action."). *See Smith v. Stewart,* 38 N.Y.2d 747, 381 N.Y.S.2d 46, 343 N.E.2d 763 (1975); *McGory v. New York State Teamsters*

ty of the pension fund "and to effectively apply its worth to the benefit of as many intended employees as is economically possible." *Gaydosh v. Lewis,* 133 U.S.App.D.C. 274, 410 F.2d 262, 266 (1969).[6] Moreover, analysis of the denial of pension benefits must begin with recognition that in a plan such as the one at issue, "[r]ealistically speaking, employe[r]s are putting money into a fund for an employee's future use which he would otherwise be getting in his paycheck." *Daniel v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 561 F.2d 1223, at 1232 (7th Cir. Aug. 20, 1977). The fact that the pension plan established by the employer and the union gives the employee only a "contingent expectancy," *Daniel, supra,* of receiving pension payments does not deprive the employee of an assertable interest *prior* to qualifying for a pension. Otherwise, the failure to meet

eligibility requirements must always mean that the denial of benefits is not arbitrary and capricious when, in fact, what is an arbitrary and capricious denial of benefits must depend on the economic limitations of the pension fund and on whether the fund, regardless of age and service requirements, is being applied for the benefit of as many employees as possible. *See Burroughs, supra* at 1131.

The legislative history of § 302(c)(5) suggests that Congress intended to grant employees whose service generates payments to a pension fund an interest in obtaining benefits that exists independently of the eligibility requirements devised by the administrators to determine the award of benefits, *i. e.,* an interest created by the employees' contributions to the fund through labor at reduced compensation.[7] One court,

*Conference Pension and Retirement Fund,* 56 A.D.2d 209, 392 N.Y.S.2d 143 (4th Dep't 1977); *Humbert v. Profit Sharing Committee of Carlisle DeCoppet & Co.,* 47 A.D.2d 755, 365 N.Y. S.2d 47 (2d Dep't 1975); *Berger v. Iroquois China Co.,* 41 A.D.2d 1018, 343 N.Y.S.2d 770 (4th Dep't 1973). Indeed, in deciding challenges to denial of pensions, at least one New York court, in defining the fiduciary duties of trustees of pension plans, relied on federal cases decided under § 302(c)(5). *Walkes v. Jarcho,* 51 A.D.2d 697, 698, 380 N.Y.S.2d 4, 6 (1st Dep't 1976).

6. In the Circuit Court of Appeals for the District of Columbia, coal miners initiated a series of cases challenging the validity of "signatory last employment" provisions limiting eligibility for the flat retirement pension provided by the United Mine Workers of America Welfare and Retirement Fund of 1950. These provisions required as a precondition to a pension that a miner cease work in the coal industry immediately following a period of employment by a mine operator signatory to the National Bituminous Coal Wage Agreement. In many instances the provision was found to be arbitrary and capricious under § 302(c)(5). *See Pete v. United Mine Workers of America Welfare & Retirement Fund,* 171 U.S.App.D.C. 1, 517 F.2d 1275 (1975) (*en banc*); *Teston v. Carey,* 150 U.S. App.D.C. 256, 464 F.2d 765 (1972); *DePaoli v. Boyle,* 144 U.S.App.D.C. 364, 447 F.2d 334 (1971); *Roark v. Boyle,* 141 U.S.App.D.C. 390, 439 F.2d 497 (1970); *Collins v. UMWA Welfare and Retirement Fund,* 114 U.S.App.D.C. 387, 439 F.2d 494 (1970); *Roark v. Lewis,* 130 U.S. App.D.C. 360, 401 F.2d 425 (1968). *See also Gaydosh v. Lewis, supra.* Although these

cases may be inapposite with respect to the jurisdictional issue, "since the federal courts are the only courts in the District of Columbia," *Cuff v. Gleason, supra* at 129, they nonetheless are based on the interpretation by the Court of Appeals of the substantive requirements of § 302(c)(5).

7. The remarks of Senator Ball, one of the Senate sponsors of § 302, are quite pertinent to the issue of whether the enactment was intended to protect employees from the arbitrary denial of pension benefits:

> With respect to the amendment adopted by the Senate dealing with welfare funds which under any kind of construction are contributed by the employer out of earnings of his employees, all that amendment does is see to it that the benefits to which employees are entitled shall be spelled out in the agreement setting up the fund which they pay for with their labor, and that it shall be in the nature of a trust fund so that the employees cannot be arbitrarily deprived of the benefits.
> So all that provision really does is to protect the rights of employees to benefits out of these funds which are created by their own labor.

93 Cong. Rec. 5147 (1947) *reprinted in* II NLRB, *Legislative History of the Labor Management Relations Act, 1947,* at 1498 (1948). In remarks inserted into the Congressional Record, Senator Ball commented on the existing pension funds:

> Far too many of these funds which, after all, represent money earned by the employees, are controlled by union leaders under such

after examining the legislative history of § 302, concluded that the language "[[s]ole and exclusive benefit of] the employees of such employers,"

> focused upon the situation in which a union attempted to extract from an employer a promise to make payments to a union that represented employes of one or perhaps more than one employer. Congress considered these payments as substitutes for wages or salaries normally paid directly to the worker. 93 Cong. Rec. 4746(2–3) and 4747(1). I Legislative History of the Labor-Management Relations Act 1947, 458. Theoretically, an employer is willing to pay a certain amount of money for a given unit of work. If an employer agreed to give five cents to a union trust fund for every hour of work by an employe, the hourly wage paid directly to the employe would be five cents less. It is only just, said Congress, that the employe whose hour's work required the employer to make a payment of five cents to the trust fund be assured of reaping the benefit of that payment. See Senator Ball, II Legislative History of the Labor-Management Relations Act, 1322 and 1498.

*Bey v. Muldoon,* 223 F.Supp. 489, 495 (E.D. Pa.1963), *aff'd per curiam,* 354 F.2d 1005 (3d Cir.), *cert. denied,* 384 U.S. 987, 86 S.Ct. 1888, 16 L.Ed.2d 1004 (1966).

■ Further, Congress, although primarily concerned with corruption, made it possible for unions to establish pension plans. The fact that the limitations placed on the management and use of such funds were not specific as to the rights of employees whose work generated contributions to the funds does not mean that Congress, having given unions and management authority to create pension plans, intended that the trustees might, without challenge, impose harsh eligibility requirements that exclude large numbers of employees from any benefits. In the final analysis, the corruption that necessitated the enactment of § 302 damaged the employees more than anyone else; it was their rights that were compromised by employer payments to union officials. Since an important purpose of the enactment was to protect employees from the collusion of union officials and management, in construing § 302(c)(5) in the face of the denial, by a jointly-administered trust, of pension benefits to employees with substantial histories of contributory employment, a court should employ, in the words of then Circuit Judge Blackmun,

> a construction policy favoring inclusion and benefits where there is no positive statutory language or inference of exclusion, rather than one favoring exclusion and a denial of benefits where there is no positive language of inclusion.

*Blassie v. Kroger Co.,* 345 F.2d 58, 68 (8th Cir. 1965) (action to enjoin alleged violations of § 302).

■ Finally, while the specific provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.,* may not be read into the standard of conduct required by § 302(c)(5), the legislative findings and policies underlying ERISA should be considered in determining what is arbitrary and capricious conduct by trustees and whether a pension plan is structurally deficient. The legislation represents the culmination of years of investigation and studies of private pension plans in the United States. Most of these plans were initiated in the last 25–30 years, H. R. Rep. No. 93–533, 93rd Cong., 1st Sess. 2, *reprinted in*

---

loose standards that they are free to give or withhold benefits at their pleasure. Again, all we are doing is protecting the rights of the employees whose toil creates these welfare funds.
93 Cong. Rec. A2377 (1947), *reprinted in* II *NLRB, Legislative History of the Labor Management Relations Act, 1947,* at 1524 (1948). *See* 93 Cong. Rec. 4876 (1947) (remarks of Sen. Taft) ("In other words, this must be a trust fund . . . it is in trust for the employees,

who, after all have earned the money.") *reprinted in* II *NLRB, Legislative History of the Management Relations Act, 1947,* at 1311 (1948); Sen. Rep. No. 105, 80th Cong., 1st Sess. 52 ("where such funds are in existence or are agreed upon by collective bargaining, they should not be subject to . . . arbitrary dispensation by union officers.") *reprinted in* I *NLRB, Legislative History of the Labor Management Relations Act, 1947,* at 458 (1948).

[1974] U. S. Code Cong. & Admin. News, p. 4640, and many were found by congressional investigators to contain unfair and arbitrary provisions. The purpose of ERISA is to remedy the significant defects uncovered in the structures of those plans. One legislative study concluded that "too many workers, rather than being able to retire in dignity and security after a lifetime of labor rendered on the promise of a future pension, find that their earned expectations are not to be realized." 120 Cong. Rec. 29928 (1974) (statement of Sen. Williams). *See* Sen. Rep. No. 93–127, 93 Cong., 1st Sess. 1–9, *reprinted in* [1974] U. S. Code Cong. & Admin. News, pp. 4838–4844. Many of the worst abuses of employee rights by pension plans involved aspects of pension funds similar to the challenged provisions of the NMU fund, such as harsh break in service rules and loss of benefits because of the failure to meet vesting requirements even though the employee had

spent many years at his job. *See id.* The fact that Congress did not extend ERISA retroactively to employees whose claims for benefits were denied prior to the effective date of the legislation does not lessen the significance of its finding of serious deficiencies in the structure of private pension plans, generally, and the unfair and needless loss of benefits through application of the types of rules at issue here, in particular.

With these basic points in mind, we turn to consider whether the challenged provisions of the NMU pension fund are so arbitrary and capricious as to violate § 302(c)(5).

### III.

 Although, in our opinion, the "break rule" and the "ten year rule" are arbitrary and capricious,[8] even in the ab-

8. With respect to the break rule, the issue is whether the trustees acted arbitrarily and capriciously in amending, in 1970, the break in service rule to require that beginning in 1951, instead of 1953, a seaman must have worked at least 200 days in any three consecutive years to avoid a break in service. A break in service rule is not, standing alone, arbitrary and capricious. The apparent purpose of the break rule as originally devised was to encourage fidelity to the maritime industry by awarding past pension credit to those seamen who spent substantial time in the industry after the pension fund was established. Only those seamen who demonstrated a consistent commitment to the maritime trade were entitled to be credited for pension purposes with time served prior to the establishment of the plan, when their work did not generate employer contributions to the fund. The plaintiff, who complied with the original break-in-service rules, was considered until 1970 to have earned with his post-1951 work the right to aggregate that work with his pre-1951 service to qualify for a pension.

The policy underlying the amendment to the break rule in 1970, however, is not apparent. First, the amendment could not have been enacted to encourage consistency of work since obviously it is not possible for any seaman now to comply with its terms if, as in Mosley's case, he had not worked the minimum time between 1952 and 1954. Curtis Mosley, who worked the minimum periods of covered employment to avoid a break under the rule as it existed, never had the opportunity to comply with the amended rule and thus protect himself "from its impact during the years to which it was

retroactively applied," *Burroughs, supra* at 1131. Yet he did demonstrate the loyalty and commitment that was asked of him during his active days as a seaman. Second, the defendants have not attempted to defend the rule on economic grounds, unlike their position with respect to the ten year rule. In the absence of an economic justification and in view of the inability of a seaman ever to comply with the new break rule, the 1970 amendment to the break-in-service rule is arbitrary and capricious.

To an extent, the requirement that a seaman seeking credit for pre-1951 work must earn ten years of credit after January 1, 1951, suffers from a defect similar to the amended break plan. This pre-condition to aggregating pre-1951 work was imposed 17 years after the fund was established. It is particularly harsh on seamen who, like Mosley, were in their forties when the plan was set up and therefore had only twenty or twenty-five years of active work available to them. By 1970 it was difficult, if not impossible, for them to add more years of service. If the ten year rule had been in effect at the inception of the plan, however, there would have been a realistic possibility that middle-aged seamen then coming into the plan, aware of the rule, could meet its requirements.

The ten year rule, as presently structured, can be criticized on another ground. The defendants contend that the ten year rule was enacted "to meet the heavy burden created by granting credit for service prior to the date for which contributions were first made." (Reply Memorandum, at 3). Presumably, the reason

sence of these rules Mosley still would not qualify for any pension under the present structure of the Plan. Six months before the plaintiff accumulated the 15 years of past and future service credit needed to qualify for the Early Retirement Plan, that plan was terminated. Mosley, by this time age 61, claims that he was no longer healthy enough to go to sea and obtain the additional years required to qualify for the other plans. Thus, despite his six and one-quarter years of pre-1951 service and his eight and three-quarters years of contributory employment, he is ineligible for any pension benefits.

The issue, however, is not whether the Trustees acted arbitrarily in phasing out the Early Retirement Plan. Section 302(c)(5) does not require a pension fund to maintain a specific plan, with specific age and service requirements. But the question remains whether, in the absence of an economic justification, it is arbitrary and capricious to deny all benefits to a worker who, after a substantial period of contributory

employment, stopped working for age or health reasons. *See* H. R. No. 93–533, 93rd Cong., 1st Sess. 6, *reprinted in* [1974] U. S. Code Cong. & Admin. News pp. 4644–45.

Our analysis begins, by way of background, with the findings of Congress concerning the vesting requirements of the post-World War II private pension plans. Vesting refers to the nonforfeitable interest that an employee acquires in a pension plan, entitling him to pension benefits. In most of the plans examined by the House and Senate Committees that drafted ERISA, an employee's entitlement to a pension does not vest until he reaches a specified age and/or acquires a minimum number of years of pension credit. A statistical analysis of 1,493 private pension plans revealed that 13% do not require vesting of benefits until the employee retires, *i. e.*, until a specified age was reached. Sen. Rep. No. 93–127, 93rd Cong., 1st Sess. 9, *reprinted in* [1974] U. S. Code Cong. & Admin. News, p. 4845. The result was that if employment

---

for the rule is to assure that only those seamen with substantial post-1951 work receive credit for pre-1951 work and, at the same time, conserve the corpus of the pension trust. Otherwise, the plan will be burdened with pension payments to seamen whose working years for the most part did not generate contributions to the pension fund.

The problem with this rationale is that the ten year rule does not consistently reward those seamen who have worked the longest time after 1951. Awarding credit on the basis of 50 day units means that in any year a varying number of days worked will not count towards a year's credit or a fraction of a credit. For example, days worked in excess of 200 in one year, or under 50 in another, do not add to a seaman's credits under the ten year rule. The result is that the pension fund will award pre-1951 credit to a seaman who worked 200 days each year from 1951 to 1960, a total of 2,000 days service after 1951. But a seaman such as Curtis Mosley, who actually worked in excess of 2,000 days, is not credited with ten years of work for purposes of aggregating past service credit simply because his working days were not efficiently distributed during his years of work after 1951. A plan that awards past service credit on the basis, not of the greatest number of days spent at sea, but on fortuitous patterns of work time, is arbitrary and capricious.

The defendant asserts that the awarding of credit in 50 day units "provides for ease of administration," and, moreover, comports with actuarial assumptions that "some seamen would not work 50 days, some would work 50, but less than 100 and some would work more than 200 days in a year" (Franco affidavit, at 4–5). Where fair treatment of pension rights is concerned, administrative convenience is a secondary concern; the Plan exists for the benefit of the seaman, not the comfort of the Trustees. As to the actuarial assumptions, assuming *arguendo* that the 50 day unit rule is justified on the basis of actuarial predictions, those predictions bear little relevance to the award of pre-1951 credit, which did not generate employer contributions. The issue is not the 50 day unit rule standing alone, but its application to seamen who seek to aggregate their pre-Plan service with post-1951 work. The criteria should be length of contributory service after 1951 which, as discussed, is not adequately measured by the 50 day unit rule. Finally, we mention that no data has been provided to demonstrate either what the cost of the Plan would be if award of pre-1951 credit was based on actual number of days worked after 1951, or what the savings are to the Plan, in the context of present assets and predicted liabilities, from the imposition of the ten year rule.

terminated prior to meeting the age or service requirement, many employees were denied benefits despite many years of employment, creating vividly documented "difficulties and hardships." *Id.* The denial of pension benefits under such circumstances is, moreover, particularly inequitable since "the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefits which he would have received." Sen. Rep. 93–383, 93rd Cong., 1st Sess. 45, *reprinted in* [1974] U. S. Code Cong. & Admin. News p. 4930. *Accord, Roark v. Boyle,* 141 U.S.App.D.C. 390, 439 F.2d 497, 504 (1970); Lee, *Credited Service After ERISA,* 31 Tax.L.Rev. 367, 377–78 (1976). *See generally* Note, *Private Pension Plans: The Prospects For Reform,* 5 Colum.Human Rights L.Rev. 465 (1973). The employee excluded from a pension thus gets the worst of both worlds: he works for years at a diminished salary in order to contribute to a pension fund and then, because of the failure to meet a restrictive vesting requirement, he is denied all pension benefits.

The Congressional response to the abuses of employees by pension plans was to impose on private pension plans minimum vesting requirements that involve either graduated vesting or a relatively short service requirement prior to 100% vesting. 29 U.S.C. § 1053.[9] Although the projected cost to pension plans was relatively small, *see* Sen. Rep. No. 93–127, 93rd Cong. 1st Sess. 73–79, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4884–89; H. R. Rep. No. 93–533, 93rd Cong. 1st Sess. 1, *reprinted in* [1974] U. S. Code Cong. & Admin. News, p. 4639, the pension funds still were expected to meet, except in unusual circumstances, whatever financial burdens result from the minimum vesting requirements. 29 U.S.C. § 1081 *et seq.*

In contrast to ERISA, nothing in the "sole and exclusive" benefit language of § 302(c)(5) imposes vesting requirements on pension funds that ignore the economic limitations of the funds as they presently exist. But the provision does require that the pension funds be used solely and exclusively for the benefit of the employees. If available funds are not applied to the benefit of employees who have contributed to the fund, and the economic needs of the fund do not require that they be withheld, the specific language of § 302(c)(5) is violated. There is no significant difference, in terms of complying with the "sole and exclusive benefit" provision, between withholding pension funds for no reason, and applying them for the benefit of persons other than employees. And it follows that § 302(c)(5) requires that the pension funds be applied for the benefit of *as many* employees as is economically possible. For example, it might be arbitrary and capricious to confer, without economic justification, pension benefits on a very few employees with extremely long service while denying benefits to a great number who worked substantial periods and thus had contributed to the pension fund through their labor. The loss of pension rights by significant numbers of employees with many years of service suggests an imbalance in a pension fund that is amenable to correction under § 302(c)(5).

■ This principle applies even though the employees may not have qualified for an existing pension plan. *See* Part II *supra.* Such an employee is entitled nonethe-

---

**9.** Under this section of ERISA, a pension plan must allow vesting in one of three circumstances. First, if an employee has "at least 10 years of service," he acquires a nonforfeitable right to 100% "of his accrued benefit derived from employer contributions." 29 U.S.C. § 1053(a)(2)(A). Second, a plan is lawful under § 1053 if an employee, who has completed at least five years of service, obtains a nonforfeitable right to a percentage of his accrued benefit derived from employer contributions. At the end of the minimum five years, the employee must acquire at least a 25% vested interest in accrued benefits, with minimum percentage increases for each year of additional service. 29 U.S.C. § 1053(a)(2)(B). Finally, a plan may provide for graduated vesting of benefits once the employee has completed at least five years of service and "the sum of his age and years of service equals or exceeds 45." 29 U.S.C. § 1053(a)(2)(C)(i).

less to some pension recognition of his service, provided that he has spent a substantial period in contributory employment. While it may be unjust that employees who have worked entirely in contributory employment should have to be burdened with pension payments to employees whose service was prior to the enactment of the fund, it is equally unfair that a seaman such as Curtis Mosley, who spent more than eight years in contributory service, is denied all benefits. Because of restrictive vesting, the older employees who do not qualify for a pension at the time of their retirement or because of health or age reasons are placed in the position of having supported through their years of contributory labor the pension payments that will eventually go to younger men now coming into the NMU. In the absence of evidence that such restrictive vesting is required because of the economic limitations of the pension fund, the failure to recognize substantial contributory employment is a violation of § 302(c)(5).

The next question, then, is what is substantial contributory employment? In *Pete v. United Mine Workers of America, Welfare & Retirement Fund of 1950*, 171 U.S. App.D.C. 1, 517 F.2d 1275 (1975), two classes of retired coal miners challenged a pension eligibility requirement that a miner must have worked five years of contributory employment during the prior 20 years of service to qualify for a flat pension. The Court of Appeals upheld the eligibility requirement, ruling that conditioning a pension on a substantial period of contributory service, *i. e.*, at least five years, conformed "to the spirit of the Taft-Hartley provision authorizing the creation of the trust." *Id.* at 1286. Otherwise, miners who had spent most of their productive years working for non-union mines would receive a pension at the expense of the miners who had worked for contributing employers.

The *Pete* case is useful as a guide to what is substantial contributory employment. If a pension plan may gear eligibility for a full pension to a minimum condition of five years contributory employment, it follows that an employee with the same period of contributory service has a claim to pension benefits, although not necessarily to a full pension. A pension fund may be legitimately concerned over payments to workers whose work has not contributed to the fund; but it must be equally concerned that an employee's substantial contributory service, *i. e.*, over five years, generate some pension benefits for that employee.

■ By this measure, Curtis Mosley's 8¾ years of post-1951 work is substantial contributory employment, entitled to recognition by the pension fund. This period of service may not, however, qualify him for a full pension. Many seamen spend thirty or forty years at sea to obtain the benefits that the plaintiff seeks on the basis of 8¾ years of contributory employment and 6¼ years of noncontributory service. Fifteen years at sea out of a working life of perhaps forty to forty-five years suggests that Mosley, for whatever reason, was at best a part-time sailor. The fund is obligated to recognize his contributory employment, but this may be done on a comparative basis of, for example, a full pension for 20 years contributory service, a half pension for ten years and so forth.

The final issue, therefore, is whether the restrictive vesting provisions of the Plan are required by the economic needs of the fund, or whether its economic foundation is strong enough to allow recognition of substantial contributory employment. According to an affidavit of Albert Franco, the Administrator of the Plan, the changes enacted in pension requirements in 1969 "were the direct result of adverse economic conditions within the industry which, if not responded to by the Trustees, would have seriously undermined the financial soundness of the Pension Plan" (Franco Affidavit, at 2). Apparently, in the late 1960's, the decrease in passenger ship service and other adverse industry conditions led to a significant loss of man days of employment. Since employer contributions are made at the rate of $14.58 per man day on company payroll, or $437.40 each 30 day month, this meant a drop in contributions to the pen-

sion fund.[10] Moreover, between 1967 and 1975, the number of persons receiving pensions rose from 7,556 to 13,822.[11] As a result, a "strain" was placed on trust assets and, in the view of the Trustees if the eligibility requirements were not tightened, "the financial viability of the Plan might well have been undermined."

The problem we have with this rationale is, first, that absolutely no information has been provided on the outstanding assets of the Plan, its projected income, and its current and projected liabilities, i. e., the specific information that led the Trustees to conclude that harsh vesting requirements were necessary to save the Plan from economic collapse. If such information was used to inform the decision of the Trustees to tighten eligibility requirements presumably it could be made available; otherwise it

10. The following is the Plan's table of "contributions and man-days contributed" in the years 1964–75:

| Year | Contributions | Total Man-Days | Year | Contributions | Total Man-Days |
|------|--------------|----------------|------|--------------|----------------|
| 1964 .... | $18,111,100 | 7,000,000 | 1970 .... | 42,718,300 * | 4,703,300 |
| 1965 .... | 18,797,600 | 6,865,600 | 1971 .... | 42,078,200 | 3,404,900 |
| 1966 .... | 22,632,200 | 7,269,400 | 1972 .... | 36,954,700 | 2,864,000 |
| 1967 .... | 36,665,500 | 7,556,600 | 1973 .... | 34,011,900 | 2,594,244 |
| 1968 .... | 44,313,800 | 6,800,000 | 1974 .... | 33,852,900 | 2,416,754 |
| 1969 .... | 40,421,900 | 5,800,000 | 1975 .... | 31,772,500 | 2,260,879 |

* Includes $1,292,900 paid in 1970 to meet 1969 deficit and excludes deficit for second half of 1970.
(Franco Affidavit, Exhibit A).

11. The progress of pension rolls under the Plan is depicted in this table:

| Year | Awards | Deaths | Suspensions | Reinstatement | On rolls at end of year |
|------|--------|--------|-------------|---------------|-------------------------|
| Cumulative through 1975 ...... | 19,894 | 5,733 | 1,360 | 921 | 13,722 |
| Cumulative through 1963 ...... | 3,817 | 878 | 201 | 166 | 2,904 |
| 1964 ..................... | 866 | 193 | 16 | 11 | 3,572 |
| 1965 ..................... | 1,101 | 221 | 25 | 10 | 4,437 |
| 1966 ..................... | 1,527 | 261 | 75 | 45 | 5,673 |
| 1967 ..................... | 2,256 | 317 | 105 | 59 | 7,566 |
| 1968 . ................... | 2,329 | 362 | 135 | 71 | 9,469 |
| 1969 ..................... | 1,787 | 439 | 235 | 103 | 10,720 * |
| 1970 ..................... | 1,529 | 459 | 159 | 108 | 11,739 |
| 1971 ..................... | 1,360 | 495 | 88 | 85 | 12,618 ** |
| 1972 ..................... | 1,217 | 507 | 59 | 67 | 13,353 |
| 1973 ..................... | 903 | 512 | 72 | 61 | 13,748 |
| 1974 ..................... | 636 | 519 | 70 | 83 | 13,894 |
| 1975 ..................... | 583 | 587 | 120 | 52 | 13,822 |

NMUPF—75

* Adjusted from 1969 figure of 10,685. Therefore, totals do not add.
** Figures for 1971, 1972, 1973 and 1974 do not add.

(Franco Affidavit, Exhibit B).

is speculation to project without supporting data a "strain" on the assets of the Plan because of the increase in award of pensions and the decrease in the man days of labor. It may be that the Plan has assets acquired in the industry's boom years sufficient to carry it past a slack period. If so, the failure to apply such a surplus to the benefit of employees whose labor generated substantial contributions to the plan is a violation of § 302(c)(5).

Second, and more important, the Trustees apparently have adopted an all or nothing approach to the award of pensions. Unless a seaman meets the tightened vesting requirements, he obtains no pension. If, as the Trustees claim, the shipping industry is in a recession, the failure to obtain sufficient years of service may be due not to lack of commitment to the industry but to the unavailability of work. Fewer and fewer seamen will be able to qualify for pensions as competition for work intensifies. Yet, their substantial work time will generate contributions to the pension fund. A relatively few individuals fortunate enough to put together enough years at sea to meet the vesting requirements thus will be supported by the labor of substantial numbers of seamen, who will have no financial support after their years at sea are over. In view of the fact that the seamen denied pensions entirely nonetheless made contributions to the fund, concentrating the benefits of the retirement funds in the hands of a relative few fails to satisfy the mandate of § 302(c)(5), and the fiduciary obligations of the Trustees, that the assets of the fund be applied to the benefit of as many of the employees as is possible. *Gaydosh v. Lewis, supra.*

A fairer and more equitable approach, perhaps, would be to vest pension credit in proportion to work time in contributory employment and, if necessary, reduce the benefits paid on full pensions. The virtue of this approach is that not only is recognition made of substantial contributory employment and that the benefits of the fund are more evenly spread, but that the award of pensions will still reflect economic conditions in the industry. As work time decreases and concomitantly, employer contributions decrease, demands on the fund will lessen since those seamen whose pensions have vested will have worked fewer years than in healthy economic times and thus receive smaller pensions. Finally, even if the Plan cannot financially accommodate this approach, it nonetheless might possess sufficient financial flexibility to provide benefits to seamen such as the plaintiff who, unlike younger seamen, because of the interaction of their age and the tightening of eligibility requirements cannot possibly work sufficient additional years to qualify for any pension.

It would, in the absence of economic data, however, be premature to impose such a requirement on the pension fund. The Trustees should be given an opportunity in the form of an evidentiary hearing to:

(1) provide the specific economic reasoning that presumably informed the decision to restrict the award of pensions and;

(2) to demonstrate that other approaches, such as those suggested above, would not be feasible.

We stress that, in view of the Trustees' failure to comply fully with requests for specific economic data and the fact that defendant controls the relevant information, the burden in this hearing rests on the defendant. At this hearing, moreover, evidence may be submitted in the form of expert testimony.

Accordingly, we direct the parties to appear for an evidentiary hearing on Friday, September 23, 1977.

It is

SO ORDERED.