Curtis MOSLEY, Plaintiff,

v.

The NATIONAL MARITIME UNION PENSION AND WELFARE PLAN, Albert Franco, Individually and in his capacity as Administrator of the NMU Pension & Welfare Plan, Shannon J. Wall, Individually and in his capacity as President of the NMU Pension & Welfare Plan, and Mel Barisic, Rick Miller, James J. Jartin, Peter Bocker, Andrew Rich, Martin F. Hickey, Captain F. K. Riley, Jr., Captain E. Marcus, Captain W. I. Ristine, Captain E. G. Denys, Kenneth W. Gunding, Individually and in their capacities as Trustees of the NMU Pension & Welfare Plan, Defendants.

No. 74 C 616.

United States District Court,
E. D. New York.

May 9, 1978.

Jack A. Kaplowitz, Huntington Station, N. Y., for plaintiff.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants; Morton M. Maneker, Jeffrey A. Mishkin, and Alexander Gigante, Jr., Phillips & Cappiello, Ned R. Phillips, New York City, of counsel.

Memorandum of Decision and Order

MISHLER, Chief Judge.

The court conducted a trial on the issues reserved in its memorandum of decision rendered in response to the parties' cross motions for summary judgment (D.C., 438 F.Supp. 413). The court finds as follows:

*Mosley's Work Record As A Seaman*

Mosley was a member of the National Maritime Union (N.M.U.) from May, 1937

until February, 1943,[1] when he left the Merchant Marine. Mosley returned to part time employment as a seaman in 1951, the year in which the Plan was established. In the eighteen year period that followed, from 1951 to 1969 when he made his last voyage, he accumulated 8¾ years of contributory employment based on the liberal method of computing service credit under the regulations adopted by trustees on August 27, 1953.[2] For most of his years of service, Mosley received only partial credit, working less than the required 200 days of covered employment. Mosley was credited with a full year of service only in 1967 (173 days of work plus 29 vacation days). In 1954, he did not work at all as a seaman, and in 1958, he worked only 56 days. Over the eighteen year period, Mosley worked in total 2,054 days.

*The Plan*

The N.M.U. Pension Plan, established in 1951, was designed to recognize members' past and future services. The Plan is funded exclusively by employer contributions under an actuarial method most commonly referred to as "Entry Age Normal Cost Contribution Plus Interest On Unfunded Accrued Liability". The contribution scheme, as originally devised, did not provide for amortization of the unfunded accrued liability (the amount required to pay benefits accrued during non-contributory, pre-plan years). Employer contributions were only calculated to cover: (1) the "Normal Cost" of the Plan or the actuarial amount necessary to fund the future payment of benefits based on credits earned by members during each year of the Plan's operation; and (2) interest on the unfunded accrued liability in order to prevent capitalization of this increment and an increasing burden on the Plan.

Until 1969, the collective bargaining agreements required signatory employers to contribute an amount based on man days of employment. Contributions were not earmarked for an individual employee, but instead were paid into an aggregate fund in order to meet existing obligations. Benefit levels in the years prior to 1964 were based on two actuarial assumptions; first, that seamen would retire after accumulating 25 years of service credit although less was required, and second, that a normal year would see 7 million man days of employment.

Prior to 1964, the Plan provided for four types of pensions: (1) the "Normal Pension" available to seamen 65 years of age with 20 years of pension credit; (2) the "Reduced Pension" open to seamen with 15 years of pension credit who have attained the age of 65; (3) the "Early Retirement Pension" available to seamen 60 years of age with 15 years of pension credit; and (4) the "Disability Pension" covering permanently disabled seamen 65 years of age or older who have 15 years of service credit. In June, 1964, the Plan was amended to provide for two additional types of disability pensions and a "Service Pension" available to seamen of any age who have accrued 20 years of service credit. The monthly benefits under this latter plan amounted to $125 in 1964 and $150 in 1965. The Plan was again amended in 1966 increasing monthly benefits under the Service Pension to $175. The increase in benefits was based in part on an actuarial assumption of 28 years of service.

1. Proof is lacking as to whether and/or when Mosley went to sea during these years. The original pension regulations credited seamen with service based on union membership and not employment records. The regulation recited:

It is recognized that in many cases it will be difficult to prove years of service prior to January 1, 1951. Consequently, if an employee is entitled to past service credits, he shall be credited with past service for each calendar quarter during any part of which he was a member in good standing of the Union.

2. Under the regulations, an employee was given a full year's credit for 200 days of covered employment in a calendar year. Vacation period was included as a period in employment. Portions of a year were credited as follows:

| Days of Covered Employment | Year to be Credited |
|---|---|
| Less than 50 | None |
| 50–99 | ¼ |
| 100–149 | ½ |
| 150–199 | ¾ |

*Decline In The Merchant Marine*

Contribution levels set by the collective bargaining agreements during the first 18 years of the Plan were based on the actuarial assumption of 7 million man days of employment each year. The assumption proved valid until 1968. However, in absolute terms the Merchant Marine experienced a consistent and dramatic decline in employees each year since 1954 and a significant increase in the number of pensioners each year. In 1954, there were 38,000 employed members of the N.M.U. with only 472 retirees receiving pension benefits; by 1962, the membership dropped to 28,550 and the number of pensioners jumped to 2,574. In 1966, while the number of employees remained relatively steady, the number of pensioners rose to 5,673. The pattern is attributable to several factors, i. e., the decline of Merchant Marine activity resulting from the end of the Vietnam war, the loss of passenger business to the airlines, and automation.

As of December 31, 1966, the level of employer contributions for the year was approximately $22.1 million [3] and the actuarial cost was approximately $21.5 million.[4] The total accrued liability amounted to $556.0 million and the assets approximated $106.1 million. For the first time since the Plan's inception, the pensioner's liability [5] —$157.8 million-exceeded Plan assets.

The financial soundness of the Plan was taxed further in February, 1967, when an arbitrator resolved a collective bargaining dispute by directing an increase in monthly benefits under the Service Pension from $175 to $250. The sharp increase in benefits caused a rise in retirements by younger seamen who under earlier benefits might have otherwise delayed in filing.[6] Not only was the 28 year service assumption now of doubtful validity, but the stability of the Plan was tested by the increase in both the pensioner's liability and the unfunded accrued liability. The next two years saw the greatest surge of new applications in the Plan's history; in 1967 there were 2,256 new applications and 2,329 new applications in 1968.

The arbitrator also directed that the unfunded accrued liability be amortized over a 25 year period. Until this point, employer contributions were calculated to retire only the interest on the unfunded liability. A corresponding increase in employer contributions was therefore ordered to compensate for the new demands placed on the trustees. The relative effect of the arbitration award is best exemplified by a comparison of the pertinent data for the years 1965 through 1969:

| Year | Contributions (Millions) | New Awards | Pensioners | Net Assets (Millions) | Pensioner Liability | Unfunded Liability |
|------|--------------------------|------------|------------|-----------------------|---------------------|--------------------|
| 1965 | 17.4 | 1.101 | 4,437 | 85.3 | 75.3 | 304.2 |
| 1966 | 22.1 | 1,517 | 5,673 | 106.1 | 157.8 | 459.9 |
| 1967 | 36.1 | 2,256 | 7,566 | 132.5 | 235.1 | 466.2 |
| 1968 | 43.8 | 2,329 | 9,469 | 159.8 | 296.0 | 469.0 |
| 1969 | 38.5 | 1,787 | 10,720 | 177.6 | 338.6 | 464.4 |

3. All dollar amounts stated are approximate to the sixth digit.

4. The "actuarial cost" is the sum of the "normal cost", i. e., the actuarial amount necessary each year to fund the future payment of pension benefits earned that year plus the interest on the unfunded accrued liability.

5. The accrued liability for pensioners is the amount of reserves necessary to meet *life-time* benefit payments to all pensioners.

6. With monthly benefit levels at $250, the Plan is required to set up a $54,500 pensioner liability reserve for 40 year old retirees and actuarially assume that lifetime payments will be $103,-600; for 65 year old retirees, the pensioner liability drops to $30,700 and expected lifetime payments to $42,600.

The soundness of the Plan was brought into question. The trustees turned to their actuary, Martin E. Segal Co., for advice. The actuary was quick to recognize that the shift in retirement patterns undermined the 28 year service assumption on which he had based his projections. Moreover, it realized that the added cost of amortization might tax employers beyond their capabilities. Unable to shift the burden onto signatory employees, the actuary suggested an adjustment of the benefit structure in order to offset the increase in actuarial cost.

*The Trustees' Response*

The trustees met in the fall of 1967 to discuss the Plan's financial problems. The elimination of the Early Retirement and Reduced Pensions as well as the five year Accidental Disability Pension was proposed.[7] In addition, it was proposed that the number of days in covered employment required for a full year's service credit be increased and to condition pre-plan service credit on the accumulation of 10 years post–1951 service credit. The proposals were submitted to the actuary for comment. By memorandum dated September 19, 1967, the actuary concurred in their suggestions, indicating that the elimination of the noted pensions should effect a significant savings and restore financial integrity to the Plan.

On April 17, 1968, the trustees passed a series of amendments which effected the following changes in the Plan:

(1) the Early Retirement Pension was eliminated effective January 1, 1969, thus giving seamen an 8 month grace period in which to meet the requirements;

(2) the Reduced Pension was similarly eliminated effective January 1, 1969;

(3) credit for pre-plan service was conditioned on the accumulation of 20 years post-1951 credit;[8] and

(4) eligibility for the Service Pension required the accumulation of 20 years service credit within 30 consecutive calendar years.

The changes prevented able seamen from retiring on the basis of 15 years credit, requiring them to accrue an additional 5 years of credit before qualifying for the Service Pension. Seamen in failing health, unable to acquire the additional 5 years of credit, were still eligible for the Disability Pension; the proposal requiring a service related injury was not adopted.

Since Mosley had not accumulated 10 years of service in the period from January 1, 1951 to December 31, 1968, the amendments denied him the pre–1951 credit of 6¼ years under the regulations adopted on August 27, 1953 (see footnote 2), thus making him ineligible for the Early Retirement Pension. Eligibility for the Early Retirement Pension after January 1, 1969 was foreclosed by its elimination.

*Discussion*

Mosley attacks as arbitrary and capricious the trustees' April 17, 1968 amendments eliminating the Early Retirement Pension[9] and conditioning the receipt of

---

7. The trustees also suggested that the Disability Pension be conditioned on accidental injury during the course of employment.

8. In order to gain credit for pre-plan service under the Plan as originally devised, a seaman had to work 200 days of covered employment between 1951 and 1953, and 200 days of covered employment in each consecutive 3 year period that followed (break-in-service rule). Effective January 1, 1970, the break-in-service rule was amended to require 200 days of covered employment in any 3 year period beginning 1951. While Mosley had worked 200 days between 1951 and 1953, and 200 days in every 3 year period thereafter, he did not accumulate

200 days of covered employment between 1952 and 1954. (483 F.Supp. 416).

9. Article II, Section 6 of the Regulations as amended on April 17, 1968 provides:

*Early Retirement Pension.* An employee shall be entitled to retire on an Early Retirement Pension *if prior to January 1, 1969,* he meets these two requirements:
(a) He has attained age 60; and
(b) He has pension credits for at least the following number or years, depending on the year in which he fulfills both age and service requirements.

pre-plan credit on the accumulation of 10 years post–1951 service by December 31, 1968 ("10 year rule").

On cross motions for summary judgment, this court, in a memorandum of decision and order dated September 7, 1977, found the 10 year rule and the amended break-in-service rule arbitrary in nature and violative of section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), (438 F.Supp. at 423 & n.8). The crucial issue remains as to whether the trustees acted arbitrarily in the application of the revised conditions to Mosley, a man who had worked substantial periods in contributory employment. This court found that the restricting vesting provisions could stand only if economically justified. A trial on the issue of that question was accordingly directed.

In rejecting plaintiff's application, defendants rely on their absolute right and responsibility to eliminate benefit programs where the financial stability of the Plan is in jeopardy.[10] Defendants maintain that the sharp decline in the number of working seamen and the concomitant rise in pensioner applications, particularly by younger retirees, seriously undermined the actuarial assumptions on which the Plan was based. The consequences of the February 1967 arbitrator's award placed unforeseen financial stress on the Plan. Defendants contend that the only solution was the elimination of benefits including revising the conditions for Early Retirement Pensions. They argue that the revisions were well within their discretionary authority.

| Year In Which Pension First Becomes Payable | Minimum Service For An Early Retirement Pension |
|---|---|
| 1954 | 10 |
| 1955 | 11 |
| 1956 | 12 |
| 1957 | 13 |
| 1958 | 13 |
| 1959 – 1968 | 15 |

**10.** Defendants place no reliance on the amended break rule in justifying their rejection of plaintiff's pension application. Nevertheless, defendants do not concede the rule's illegality. The trustees contend that the 1970 amendment ". . . represents a legitimate exercise of

We note at the outset that unlike the Provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, there is nothing in the "sole and exclusive benefit" language of section 302(c)(5), LMRA, 29 U.S.C. § 186(c)(5), which imposes mandatory vesting requirements on pension funds. *Roark v. Boyle*, 141 U.S.App.D.C. 390, 397, 439 F.2d 497, 505 (1970); *Lugo v. Employees Retirement Fund of the Illumination Products Industry*, 388 F.Supp. 997, 1002 n.2 (E.D.N.Y. 1975), *aff'd.*, 529 F.2d 251 (2d Cir. 1976); *see also, Riley v. MEBA Pension Trust*, 570 F.2d 406 (2d Cir. 1977). This is not to say that trustees can operate free from judicial scrutiny. Some rational nexus must be shown between the need for restrictive vesting requirements and the Plan's purpose.[11] *Lugo v. Employees Retirement Fund of the Illumination Products Industry*, 366 F.Supp. 99, 103 (E.D.N.Y.1973). The court's role in reviewing actions of trustees of pension funds is limited. It is not to develop a federal common law, *Lugo*, 529 F.2d at 255, nor to pass on the "rightness" of the trustees' decision. The court's function is to examine the good faith and rationale of the trustees' decisions. *Riley v. MEBA Pension Trust*, at 409. In determining the distribution of benefits among competing classes of workers, the trustees may consider loyalty to the craft and the effect the benefits will have in retaining qualified, full time employees in the industry. *Roark*, 439 F.2d at 508. The trustees may favor covered employees whose sole employment

[their] discretion to amend eligibility requirements in order to eliminate the inequity that resulted under the prior break rule." (Defendants' Pre Trial Memorandum at n.6).

**11.** Conversely, an applicant such as Mosley, whose right to a pension had not yet vested at the time of the amendment's passage, cannot normally be deprived of benefits without first affording him the opportunity to protect himself against the impact of the amended requirements retroactively applied. *Burroughs v. Board of Trustees of the Pension Trust Fund For Operating Engineers*, 542 F.2d 1128, 1131 (9th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977).

is in the industry as against casual or part-time employees who are in land based employment. *Riley*, at 412. The precise issue is whether the April 17, 1968 amendments to the Plan denying plaintiff the opportunity for the Early Retirement Pension was a rational solution of the financial problems the Plan faced.

The Pension and Welfare Agreement and Declaration of Trust effective August 1, 1950, vests the trustees with " . . . full authority to determine all questions of coverage and eligibility . . . and . . . the power to construe . . . " its provisions and terms.[12] The N.M.U. Pension Trust Declaration expands on the scope of the trustees' powers; it vests in the trustees the discretion to:

> formulate and adopt a pension program for the exclusive benefit of Employees and promulgate and establish rules and regulations for the operation thereof; and in pursuance thereto (but without intent to limit such authority) formulate and establish conditions of eligibility with respect to age and length of service, qualifications for early or disability retirement, past and future service credits, the method of providing pensions, the payment of premiums in the event annuity policies are part of the program, the purchase, handling, control and disposition of such policies, and all other matters which

the Trustees in their discretion may deem necessary or proper to effectuate the purposes and intent of the pension program. *Id.*, Art. III, Sec. 1(d).

In defining benefit levels, the trustees are limited only to the extent that they cannot reduce the benefits of retirees so long as there are available funds. *Id.*, Art. VI, Sec. 1.

■ The court recognizes that the trustees' fiduciary duty to both the Pension Fund and its beneficiaries, *see Lamb v. Carey*, 162 U.S.App.D.C. 247, 498 F.2d 789, 793 (1974), *cert. denied*, 419 U.S. 869, 95 S.Ct. 128, 42 L.Ed.2d 108 (1975), presents an unavoidable and troublesome conflict of interest. On the one hand, the trustees must act to safeguard the financial integrity of the Plan; on the other, they must balance the competing interests of several classes of potentially eligible seamen in distributing available funds for benefits, and providing for benefits through employer contributions. The wide discretion vested in the N.M.U. Pension trustees to prescribe conditions of eligibility carries with it the inherent power to prefer one class of beneficiaries over another provided there exists a rational basis for the preference. Equality in treatment is not required. *Toensing v. Brown*, 528 F.2d 69, 71 (9th Cir. 1975);[13] *Lugo*, 388 F.Supp. at 1002.

---

12. Article IV of the Agreement and Declaration of Trust is the source of the trustees' broad powers. It provides in pertinent part:

> 1. *Benefits.* The Trustees, by majority vote, shall have full authority to determine all questions of nature, amount and duration of benefits to be paid under the Plan based on what it is estimated the Fund can provide without undue depletion or excessive accumulation.
> 2. *Coverage and Eligibility.* The Trustees, by majority vote, shall have full authority to determine all questions of coverage and eligibility to participate in and receive the benefits of the Plan and shall have the power to construe the provisions of this Agreement and the terms used herein and any such questions so determined or any construction so adopted by the majority of the Trustees shall be binding upon all parties and persons concerned.
>
> \*　\*　\*　\*　\*　\*

11. *General Authority of Trustees.* Trustees are authorized by majority vote to take any and all action which in their judgment is required for the proper administration of the Plan, provided the same is not inconsistent with the provisions hereof. The certificate of the Chairman and Secretary shall be evidence that such action has been taken or authorized in accordance herewith.
(The Agreement and Declaration of Trust and amendments thereto were submitted to the court after trial and made part of the record on consent of the parties.)

13. The court in *Toensing v. Brown* found no section 302 violation in the trustees' decision to award active employees a larger increase in pension benefits than retirees. While the pension rights of active employees was a mandatory subject of collective bargaining, the court observed that the rights of retirees was not. The court went on to note that if the union on its own undertakes to negotiate for retirees, it owes them nothing more than a duty of fair

The original design of the Plan—to recognize past and future service—was subverted by the economic conditions of the mid 1960's. Between 1963 and 1968 the number of pensioners tripled, increasing pensioner liability almost seven-fold; the unfunded accrued liability also rose. The gain in the assets of the Fund did not keep pace. In 1966 the continued decline of business in the shipping industry was apparent, and its future dark. It was clear to the industry that the number of seaman and man days of work would decrease, while the number of pensioners and dollar benefits would increase. The actuarial assumptions which had guided the trustees until 1966 were no longer valid. The financial consequences of the February, 1967 arbitrator's award made reduction of benefits imperative.

The creation of a pro rata pension with reduced benefit levels conditioned on 5 years of service credit would have been too costly. Its creation now with retroactive effect would be prohibitive. The economic posture of the Plan in the late 1960's necessitated a reduction in eligible pensioners. The 10 year rule was directed at this end. It had the effect of favoring regular employees at the expense of "casual" seamen such as Mosley, who had accumulated less than 9 years of credit in 18 years since 1951. The trustees' action in effecting the rule was entirely consistent with their contractual powers and the spirit of their legal obligation. It served to protect the pensions of seamen who had worked long in contributory service and had demonstrated dedication to maritime service, while it had little effect on pre-plan seamen. Mosley had more than 18 years in which to gather 10 years of credit.

The 1968 amendments were precipitated by economic changes. The trustees acted within their power and consistent with the intended purpose of the Plan—"to provide benefits to Employees who remain in Cov-

ered Employment more or less continuously over a period of years and up to the time when they retire on a pension," N.M.U. Pension Regulations, Art. III, Sec. 5. The amendments implementing the 10 year rule and eliminating the Early Retirement Pension restored financial soundness to the Plan by eliminating covered seamen who were not employed full time since 1951. In discriminating between full and part-time seamen, the trustees acted within their discretionary authority.

For the reasons stated, defendants' motion for summary judgment is granted, and plaintiff's cross motion for the same is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing the action, and it is

SO ORDERED.

---

representation. But the duty of fair representation, the court concluded, did not require a demand for equal benefits. Indeed, the court noted that the trustees " . . . would have

violated their fiduciary duty had they ignored information pertinent to the effective administration of the Fund." *Id.,* 528 F.2d at 72.