670 F.2d 387
 114 L.R.R.M. (BNA) 2190, 93 Lab.Cas. P 13,219,
3 Employee Benefits Ca 1083
 ADAMS, Gustav A., Andrew F. Dopkins, and Robert Malcolm,
deceased by his Executrix Lillian Malcolm
v.
Trustees of the NEW JERSEY BREWERY EMPLOYEES' PENSION TRUST
FUND, LOCAL UNION 843, I.B. of T., Falstaff
Brewing Corporation, and Joseph M. Byrne
Co., a corporation of the
State of New Jersey.
MICHOTA, Bruno; Walter Lemke; Abraham Geliman (sic);
Lawrence Balback; Bolly Bonk; William Dunne; Bernard
Kosciewicz; Siegfried Milchram; Howard Sears; Stephen
Gardzinski; Harry Wolf; Bruno Dziedzic; William Riedel;
Salvatore Guarneri; Samuel Monto; Fermin Loma; Vincent
Sadowski; Stanley Kiesnowski; Anthony Bellina; Frank
Pavolonis; William Roesch; Michael Duda; Edward
Strittmatter; Frederick Hubner; Peter Rudy; Harold
Wanthouse; Joseph Duffy; Joseph Coyle and Grace Green (Widow
of Harold Green, Deceased)
v.
ANHEUSER BUSCH, INCORPORATED (Budweiser); P. Ballantine &
Sons; Pabst Brewing Company; Falstaff Brewing Corporation;
Investors Funding Corporation; Rheingold Breweries, Inc.;
The New Jersey Brewery Employees' Pension Trust Fund; Henry
T. Hamilton; Herbert V. Johnson; Frank A. Jackiewicz; Frank
Sullivan; Herbert Heilmann, Jr.; Henry Tchorzewski; Benno
Merker and Arthur Spinello as Trustees of The New Jersey
Brewery Employees' Pension Trust Fund, the Pension Benefit
Guaranty Corporation as Trustee for the New Jersey Brewery
Employees' Pension Trust Fund.
PENSION BENEFIT GUARANTY CORPORATION, Defendant-3rd Party Plaintiff,
v.
CHOCK FULL O'NUTS CORPORATION, 3rd-Party Defendant.
Appeal of Bruno MICHOTA, Walter Lemke, Abraham Gellman
(sic), Lawrence Balback, Bolly Bonk, William Dunne, Bernard
Kosciewicz, Siegfried Milchram, Howard Sears, Stephen
Gardzinski, Harry Wolf, Bruno Dziedzic, William Riedel,
Salvatore Guarneri, Samuel Monto, Fermin Loma, Vincent
Sadowski, Stanley Kiesnowski, Anthony Bellina, Frank
Pavolonis, William Roesch, Michael Duda, Edward
Strittmatter, Frederick Hubner, Peter Rudy, Harold
Wanthouse, Joseph Duffy, Joseph Coyle and Grace Green (widow
of Harold Green, deceased), the individual plaintiffs in
their individual capacity and not as representatives of the
plaintiff class (plaintiffs in D.C. Civil No. 77-2534), in
No. 81-1347.
Appeal of PENSION BENEFIT GUARANTY CORPORATION, defendant in
D.C. Civil Nos. 76-1931 and 77-2543, and
third-party defendant in D.C. Civil No.
77-2543, Chock Full O'Nuts
Corporation, in No. 81-1348.
 Nos. 81-1347, 81-1348.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 13, 1981.
Decided Jan. 11, 1982.
Rehearing Denied Jan. 26, 1982.
Rehearing and Rehearing In Banc Denied Feb. 10, 1982.
 
 Richard K. Coplon (argued), Bernard Hellring, Hellring, Lindeman, Goldstein & Siegal, Newark, N. J., for Bruno Michota, et al., Individual plaintiffs-appellants and plaintiff class appellees.
 Stephen D. Schrieber (argued), Pension Benefit Guaranty Corp., Henry Rose, Mitchell L. Strickler, Baruch Fellner, James N. Dulcan, Washington, D. C., for Pension Benefit Guaranty Corp.
 Martin I. Shelton, New York City (argued), Roger Cukras, Dean G. Yuzek, Christopher J. Sues, New York City, Whipple & Ross, Newark, N. J., Shea & Gould, New York City, for Chock Full O'Nuts Corp.
 Edward F. Ryan (argued), Laurance Reich, Rosemary A. Hall, Carpenter, Bennett & Morrissey, Newark, N. J., for Anheuser-Busch Inc.
 Lawrence A. Whipple, Jr., Whipple & Ross, Newark, N. J., for Rheingold Breweries, Inc. and Chock Full O'Nuts Corp.
 John J. Rizzo (argued), Stryker, Tams & Dill, Newark, N. J., for Pabst Brewing Corp.
 Before HUNTER, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 HUNTER, Circuit Judge.
 
 
 1
 1. This case comes before us by means of the district court's certification of its judgment for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1976). On February 5, 1981, we granted the petition of the Pension Benefit Guaranty Corporation ("PBGC") for permission to appeal.[1]
 
 
 2
 2. The district court held that the trustees of the New Jersey Brewery Employees Pension Trust Fund, in amending the Trust Fund Agreement to include a partial termination of benefits clause, acted in an arbitrary and capricious fashion, thereby rendering the clause null and void. The court's holding enabled the plaintiffs to receive pension benefits under the remaining terms of the Trust Fund and the pension plan enacted pursuant to it. As a result, the PBGC, as the statutorily created successor to the now-terminated Trust Fund,[2] is presently obligated to pay any nonforfeitable benefits for which the Trust Fund was liable.[3]
 
 
 3
 3. Plaintiffs below then sought to impose direct liability for pension benefits upon the employers signatory to the Trust Fund Agreement. The district court held that no such liability existed. The individual plaintiffs also claimed that Anheuser-Busch improperly excluded them from its seniority lists. The district court found these claims to be barred by the failure to use mandatory grievance and arbitration procedures required by the collective bargaining agreement then in effect.
 
 
 4
 4. We agree with the district court in its holding that the plaintiffs were barred from litigating claims properly the subject of arbitration. We also agree with the conclusion that direct liability for pension benefits should not be imposed on the employers who were signatory to the Trust Fund Agreement. We disagree with the district court in its conclusion that the partial termination clause was void. We hold that the creation of the partial termination clause was a valid exercise of the trustees' discretion, and we accordingly reverse this aspect of the judgment of the district court. We remand for a determination as to whether proper notification of the partial termination clause was required and properly given to the employees covered by the Trust Fund.
 
 FACTS
 
 5
 5. In 1956, Anheuser-Busch, Inc. ("Budweiser"), P. Ballantine & Sons ("Ballantine"), Liebmann Breweries, Inc. ("Rheingold") and Pabst Brewing Company ("Pabst"), among others,[4] entered into a Trust Fund Agreement with the Brewery Workers Joint Local Executive Board of New Jersey (Teamsters Locals 843 and 153, the "Union") and the New Jersey Brewers Association. The Trust Fund was established pursuant to § 302(c)(5) of the Labor Management Relations Act of 1947 ("LMRA"),[5] and was administered by eight union trustees and six "employer" trustees.[6] Pursuant to the terms of the Trust Fund, the trustees established a pension plan ("Brewery Plan") in June 1956, effective retroactively to August 1, 1955. Familiarity with the salient provisions of the Trust Fund Agreement and the Brewery Plan is necessary in order to evaluate the claims of the various parties.
 
 
 6
 6. The Trust Fund Agreement was limited to administrative and procedural matters. It imposed no obligations on any of the employers to contribute to the Trust Fund nor did it require the employers to guarantee benefits. To the contrary, it specifically disclaimed the existence of any such obligation.[7] The source of each firm's obligation to contribute was its individual collective bargaining agreement.[8] An employer could withdraw from the Trust Fund at any time, with no further obligations under either the Brewery Plan or the Trust Fund.[9]
 
 
 7
 7. The district court accurately summarized the original pension benefit provisions:
 
 
 8
 Article I, § 14 of the Brewery Plan defined Credited Service as the years of an Employee's past service and future service credit. Past service referred to the years an employee had worked prior to his employer becoming a contributor to the Trust Fund. Article I, § 14(b). Future service referred to credit received by an employee for employment from the time his employer was obligated to contribute. Article I, § 14(a). As in the Trust Fund, the term Employer in the Brewery Plan referred to an employer obligated to contribute to the Trust Fund by the terms of a CBA. Article I, § 9. An Employee meant an employee on behalf of whom contributions shall be required by virtue of CBA. Article I, § 11.
 
 
 9
 Appendix at 407-08. The court proceeded to explain the service requirements for pension benefits. A pension would be paid only if an employee met the following conditions:
 
 
 10
 A. An employee was at least sixty-five years of age and had ten years of credited service (Article II, § 1);
 
 
 11
 B. An employee reached the compulsory retirement age of sixty-eight years (Article II, § 1);
 
 
 12
 C. An employee was at least sixty years of age, had fifteen years of credited service and elected early retirement (Article II, § 2);
 
 
 13
 D. An employee was at least fifty years of age, totally and permanently disabled, and had fifteen years of credited service (Article IX, § 1).
 
 
 14
 Appendix at 38, 40.
 
 
 15
 8. Employees would lose their credited service if they had less than ten years of credited service, ceased to be employed by a participating employer, and were not re-employed by a participating employer within one year. Article I, § 14(c); Appendix at 37. Employees of an employer who ceased to be a participating employer were treated as if their employment ended on the date of withdrawal. Article VII, § 1; Appendix at 40.
 
 
 16
 9. The amount of the pension to be received by an employee upon retirement was determined solely by the trustees. The employers' obligations, as defined in each collective bargaining agreement, were only to the Brewery Plan, and were specified in terms of a fixed contribution per compensable day. Appendix at 438. There was no promise by any of the employers to pay a particular pension benefit to any employee or group of employees.
 
 
 17
 10. In the late 1960's, the trustees, the Union, and the employers became concerned over the declining health of the brewery industry and its effect upon the trust's solvency. Declining employment in the brewery industry was a major factor in the growing financial problems of the Trust Fund. By the late 1960's the Trust Fund had an unfunded accrued liability of over $20,000,000.[10] A "run" on the Fund caused by the withdrawal of one of the larger employers would have forced the Brewery Plan into insolvency. In 1967, the Union and the employers entered into an area-wide collective bargaining agreement in which they agreed that the Brewery Plan should be amended to protect the solvency of the Trust Fund. The 1967 agreement required the trustees to amend the Brewery Plan to include a partial termination of benefits clause. Appendix at 62-63.
 
 
 18
 11. The pivotal section of the Brewery Plan-Article VII-was adopted in 1970.[11] In general it provided that a pension would be paid to an employee of a withdrawn employer if any of the following conditions existed:
 
 
 19
 A. An employee had ten years of credited service and had reached the age of sixty-five.
 
 
 20
 B. An employee had fifteen years of credited service and had reached the age of sixty.
 
 
 21
 C. An employee had at least ten years of credited service with one or more employers remaining an employer in the Brewery Plan.
 
 
 22
 D. An employee had thirty years of credited service, regardless of his age.
 
 
 23
 E. An employee was on the regular seniority roster of a remaining employer for at least ninety-five days of the year following his employer's withdrawal.
 
 
 24
 F. An employee had left the withdrawing employer's employ at least three months prior to the employer's withdrawal, and the employee was otherwise eligible for benefits.
 
 
 25
 12. The amendment also required the trustees to evaluate the financial condition of the Trust Fund after the withdrawal of an employer, because of the resulting loss of contributions. If the solvency of the Trust Fund was still in question after taking into account the termination of benefits provided for in the amendment, the Trustees were to reduce the level of benefits payable to future retirees.
 
 
 26
 13. By July 31, 1971, one year after the adoption of the partial termination clause, the unfunded accrued liability of the Trust Fund was reduced by almost $8,000,000. Appendix at 253.
 
 
 27
 14. On April 1, 1972, Ballantine closed its Newark brewery and stopped making contributions to the Trust Fund. Ballantine had been on the brink of insolvency for a number of years; its condition had been one of the prime factors behind the implementation of the partial termination clause. It is undisputed that Ballantine's closing effected a major disruption in the brewery industry in New Jersey. Appendix at 411.
 
 
 28
 15. Ballantine's closing had a severe impact on the potential solvency of the Brewery Plan. As required by Section 2 of the 1970 amendment, the trustees met to review the financial condition of the Trust Fund after the withdrawal of Ballantine. The level of benefits was reduced.
 
 
 29
 16. After the closing of Ballantine's plant, the Unions began to complain to the trustees that the partial termination clause was too severe. On September 22, 1972, Article VII was amended.[12] Instead of saving credited service by working ninety-five days on the regular seniority list of a remaining employer, credited service could now be saved by accumulating the same amount of time "employed by another single employer under" the Brewery Plan.
 
 
 30
 17. A number of Ballantine's former employees left the beer industry when Ballantine shut down. Many others went to work for Falstaff Brewery Corporation ("Falstaff"), which required a temporary work force to move inventory from Newark to North Bergen, New Jersey, as it had purchased some of Ballantine's assets. Falstaff did not have a collective bargaining agreement with the Union, but did agree to follow the Ballantine collective bargaining agreement for a limited time. When this temporary agreement expired, Falstaff took the position that no collective bargaining agreement was in effect. The movement of the inventory was completed by November, 1972, at which time over 100 men were laid off by Falstaff.
 
 
 31
 18. Until 1973, Falstaff had contributed pension monies into an escrow fund rather than into the Trust Fund. Falstaff established its own plan pursuant to a 1973-1976 collective bargaining agreement and deposited the escrow funds into its own plan (the "Falstaff Plan") pursuant to an arbitration award. Further, Falstaff agreed with the Union to offer to rehire the approximately 100 former Ballantine employees it had laid off upon completion of the inventory transfer. Not one of the present plaintiffs accepted. Under the agreement between Falstaff and the Union, the Falstaff Plan would have recognized all of the credited service rehirees had earned under the Brewery Plan. Apart from this agreement, service time spent at Falstaff would not save credited service earned at Ballantine, since Falstaff was not an employer under the Brewery Plan. Thus, those former Ballantine workers who went to work for Falstaff and left Falstaff's employ failed to qualify for pension benefits under the Brewery Plan.
 
 
 32
 19. None of the former Ballantine employees could obtain regular employment at Pabst or Rheingold as neither employer had positions available. Most of these men went to work for Budweiser. By June 1, 1973, all of the named plaintiffs, including the Ballantine-Falstaff employees, had secured employment at Budweiser. Appendix at 414. These employees claimed that they were entitled to be placed on seniority rosters of any employer signatory to the Brewery Plan, since each collective bargaining agreement provided regular employees with "reciprocal rights" with other signatory employers. Appendix at 413. This "right," the right to assume a spot on the regular seniority roster upon being laid off by another employer, was not recognized by Budweiser for two reasons: first, because Ballantine was no longer a signatory employer, providing no reciprocity to Budweiser's employees and being entitled to no reciprocity itself, and second, because Budweiser had no permanent positions available. Appendix at 413, 441.
 
 
 33
 20. With the amendment to the partial termination clause, a large number of former Ballantine employees maintained their credited service by working 95 days at Budweiser. Appendix at 101-06. Further, Budweiser and the Union agreed to an amendment to their collective bargaining agreement to provide seniority status to an "unattached regular" who worked for 225 days. Appendix at 413.
 
 
 34
 21. Budweiser's refusal to place the former Ballantine and Ballantine-Falstaff workers on its seniority roster was contested by the employees; however, no grievance or arbitration petitions were filed. The collective bargaining agreement between Budweiser and the Union required that any difference over wages, hours of work, or working conditions, as well as any matter involving the interpretation, application or claimed violation of the agreement, be submitted to grievance and arbitration committees for resolution.[13]
 
 
 35
 22. In 1973, Budweiser and Pabst stopped making contributions to the Trust Fund and established separate pension plans for their employees. Those employees who were not on the seniority list as of June 1, 1973 were not entitled to gain credit for benefit purposes for past service in the Brewery Plan. Appendix at 413. Those employees who retained their service credit under the Brewery Plan became entitled to receive benefits under the Budweiser Plan.
 
 
 36
 23. The last remaining employer in the Brewery Plan was Rheingold, which contributed to the Trust Fund until it ceased operations at its Orange, New Jersey brewery in 1977. As Rheingold was the last contributing employer, the trustees terminated the Plan. The PBGC was appointed statutory trustee in June 1978.[14] The Plan remained insolvent.[15]
 
 PROCEDURAL HISTORY
 
 37
 24. The complaint in this action, Michota, et al. v. Anheuser Busch, Inc., et al., was filed on December 12, 1977. The named plaintiffs (hereinafter "Michota" plaintiffs) included eighteen former Ballantine employees subsequently employed by Falstaff between April and November, 1972 and by Budweiser at some time thereafter. These individuals are denominated in the complaint as "Ballantine-Falstaff-Budweiser" employees. One widow of a Ballantine-Falstaff-Budweiser employee was named as a plaintiff. The remaining ten named plaintiffs are former Ballantine employees who worked for various brewery defendants, primarily Budweiser, after the closing of Ballantine's brewery. All ten eventually secured employment with Budweiser and are herein denominated "Ballantine-Budweiser" plaintiffs.
 
 
 38
 25. The Michota plaintiffs claimed to be entitled to pension benefits under either the Brewery Plan or the Budweiser Plan. As to the Brewery Plan, benefits were claimed on five grounds: 1) the trustees' actions in enacting the partial termination clause were arbitrary and capricious and therefore void; 2) the employers were directly liable for the payment of all Trust Fund and Brewery Plan obligations by virtue of their status as former contributors to the Trust Fund; 3) Pabst, Budweiser and Rheingold promised to fund pension benefits and are estopped from denying liability; 4) Pabst, Budweiser and Rheingold defrauded the plaintiffs by failing to disclose the manner in which credited service might be forfeited; and 5) Pabst, Budweiser and Rheingold were derivatively liable for a breach of fiduciary duty by the trustees in the adoption and application of the partial termination clause.
 
 
 39
 26. The Michota plaintiffs' claim against Budweiser is based upon Budweiser's refusal to grant seniority status to plaintiffs on their first day of work. This, the Michota plaintiffs claim, was in violation of Budweiser's collective bargaining agreement and prevented plaintiffs from receiving credit under Budweiser's Plan for service credits earned under the Brewery Plan.
 
 
 40
 27. On April 25, 1979, the district court consolidated this action with the case of Adams, et al. v. Trustees, et al., which had been filed on October 7, 1976, and involved three former Ballantine employees who had left the brewery industry after Ballantine's closing. The Michota plaintiffs added an additional count to their complaint, alleging that they had nonforfeitable rights to pension benefits under the Brewery Plan which the PBGC is required to guarantee. A class was certified, but only as to this additional count against the PBGC. The class was preliminarily defined as all former Ballantine employees with ten or more years of credited service as of May 25, 1970 or April 1, 1972 who are not presently receiving pension benefits.[16] The Michota plaintiffs can be distinguished from the plaintiff class and the Adams plaintiffs by their continued employment in the beer industry.
 
 
 41
 28. Cross-motions for summary judgment resulted in the district court's determination that the partial termination clause was arbitrary and capricious, thereby rendering it void. The district court found for defendants on all other counts. As the court below excised the partial termination clause from the Plan, it was unnecessary for it to determine if proper notice of the 1970 Amendment (which included the partial termination clause) was given to the employees. As we will reverse on this issue, and hold the partial termination clause valid, a remand is necessary for a determination of the sufficiency of the notice.
 
 
 42
 29. Also to be decided on remand are claims and cross-claims by and between the PBGC and various employers (Pabst, Budweiser and Chock Full O'Nuts). These claims cannot be decided until a determination is made as to the amount of PBGC's liability for pension benefits. This determination requires prior resolution of the "notice" issue in order to determine the extent of the benefits due under the Plan.
 
 
 43
 30. The district court, noting that "the liability of the PBGC presents the core issue in this litigation,"[17] certified its judgments for appeal pursuant to Fed.R.Civ.P. 54(b) and 28 U.S.C. § 1292(b) (1976). On February 5, 1981, this court granted permission to appeal.
 
 DISCUSSION
 The Partial Termination Clause
 
 44
 31. The Taft Hartley Act (the Labor-Management Relations Act, "LMRA")[18] established a set of rules to govern labor-management relations. Section 302 of the Act[19] prohibits employers from making direct payments to a union. An exception is provided in § 302(c)(5)[20] for contributions "paid to a trust fund established ... for the sole and exclusive benefit of the employees of such employer, and their families and dependents." Jurisdiction is conferred upon district courts to "restrain violations of this section."[21] Under this provision, a district court is empowered to
 
 
 45
 enforce a trust fund's compliance with ... subsection (c)(5) by eliminating those offensive features in the structure or operation of the trust that would cause it to fail to qualify for a (c)(5) exception.
 
 
 46
 Associated Contractors v. Laborers Int'l Union, 559 F.2d 222, 225 (3d Cir. 1977). This court has concluded that an eligibility requirement which arbitrarily excludes employees from benefits does not operate for the sole and exclusive benefit of the employees and therefore constitutes a "structural defect" under § 302 and must be eliminated from the trust. Knauss v. Gorman, 583 F.2d 82 (3d Cir. 1978).[22] In order to determine whether an eligibility requirement passes muster, an analysis must be made of the facts and circumstances surrounding its enactment.
 
 
 47
 32. The trustees of a pension plan have a fiduciary duty to preserve the financial security of a pension fund and to apply the assets of the fund for the benefit of the employees to the greatest extent possible.[23] We recognize that these respective obligations are often conflicting.[24] Any action taken by the trustees is bound to be categorized as arbitrary by those adversely affected by it. Partly because of these conflicting obligations, trustees are given broad discretion to act. Our role in reviewing the actions of trustees of pension funds is limited.[25] As we noted in Knauss, a finding of arbitrary and capricious action must be made before we will excise a clause such as the one before us. Various factors facilitate this determination: 1) Did the partial termination clause divest the employee of otherwise sufficient service credits? 2) Was the break in service involuntary? 3) Were the exceptions provided in the clause irrational? 4) Most importantly, did the trustees' action in adopting the clause lack substantial justification?
 
 
 48
 33. There is no question that the partial termination clause divested the employees of otherwise sufficient service credits. By definition, the plaintiff class includes all former Ballantine employees who would have been eligible for a pension upon retirement had the 1970 Amendment not been enacted. Appendix at 458.
 
 
 49
 34. We now turn to the second factor set forth above. Because plaintiffs did not meet their burden of showing that the break in service was involuntary, we cannot rule that it was. In this regard, Knauss is distinguishable. There we noted that the "failure to continue work arose not out of any voluntary abandonment by (Knauss) of employment with contributing (employers) but ... from the unavailability of positions with other covered employers." 583 F.2d at 88-89. This is to be contrasted with the decision of the Ballantine-Falstaff-Budweiser employees to refuse positions with Falstaff, positions which would have preserved all service credit earned at Ballantine. Moreover, while the record shows that the brewery industry was on the decline, it evidences with equal clarity the success of all the individual plaintiffs in eventually gaining employment with Budweiser.
 
 
 50
 35. The third factor-the rationality of the partial termination clause and its exceptions-requires an understanding of the effects of the clause. From its inception, the Brewery Plan provided that an employee would receive pension benefits at age sixty-five if he had accumulated at least ten years of credited service. This was the case even after the adoption of the partial termination clause.[26]
 
 
 51
 36. The partial termination clause dealt only with employees of a "withdrawn" employer. All other employees retained the rights which they had accumulated under the Brewery Plan prior to its amendment. If an employer withdrew from the Plan, its employees would be eligible for pensions as discussed above. The conditions precedent to qualifying for pension benefits under the partial termination clause seem to provide for pensions to be paid to older employees who would probably be less likely or less able to find another position in the brewery industry. Younger employees were required to find positions with other contributing employers before they would receive pension benefits. We do not believe that this formulation is impermissible or irrational.
 
 
 52
 37. Nor do we believe that the partial termination clause should be stricken because the trustees established a rule that a worker would fall within the ambit of the partial termination clause, and thus be denied benefits, if he terminated employment within ninety days of his employer's withdrawal.[27] We can discern a strong purpose for the ninety day requirement: it prevented employees from avoiding partial termination of benefits by quitting "en masse" as soon as they received word of an employer's upcoming withdrawal-action which would render the partial termination clause useless. This sudden exodus would not allow for employee assimilation by other employers. This is especially true in this case, in which we have a declining industry with few jobs available. Had there been a greater period between the time that Ballantine announced its closing and the actual date of its closing, loss of potential pensions might never have occurred.
 
 
 53
 38. In an industry where there are too many workers for too few jobs, some means of adjusting this imbalance must be found. The effect of the partial termination clause was to encourage employees who had at least ten years of credited service to leave the employ of the brewery while retaining full pensions. The Brewery Plan would have benefited from the departure of workers who had accumulated ten years of credited service, since all money paid into the Trust Fund while they worked was matched by a concurrent (and increasing) liability. The employment of workers without ten years of credited service would obligate the employer to make contributions to the fund, without the Brewery Plan automatically incurring additional liabilities.[28] This program would eventually lead the Brewery Plan back onto solid financial footing, while at the same time paying full pension benefits to the employees who had accumulated ten years of credited service and had left the industry.
 
 
 54
 39. The rationality of these conditions depends in large part upon the justification for their enactment. Without substantial justification, an arbitrary break-in-service provision which deprives an otherwise eligible employee of all benefits must fall.[29] Such a clause would constitute a "structural violation" under § 302(c)(5) of the LMRA.[30]
 
 
 55
 40. There can be no doubt that substantial justification for the trustees' action existed in this case. Even the attorney for plaintiffs admitted as much below:
 
 
 56
 The Court: You agree that the '70 amendments were adopted in an attempt to keep the plan actuarily sound? Do you dispute that?
 
 
 57
 I don't want to sit here for ten days and listen to evidence to come up with an obvious answer. There couldn't have been any other motivation for it.
 
 
 58
 (Plaintiffs' Attorney): I suppose that was a motivation.
 
 
 59
 The Court: The '70 amendments were adopted in an attempt, unsuccessful as it turned out, to keep this plan functioning and actuarily sound. Any doubt about that?
 
 
 60
 (Plaintiffs' Attorney): I don't think there can be.
 
 
 61
 Appendix at 376. We have already noted that the unfunded actuarial liability exceeded $50,000,000 at the time of the adoption of the 1970 amendment.
 
 
 62
 41. We agree with the district court that substantial justification will not save every break in service provision. But we are looking solely at the controversy before us. Our analysis reveals that this was a reasonable attempt by the trustees to preserve the viability of the Brewery Plan and the Trust Fund.
 
 
 63
 42. The district court in reaching a contrary opinion stated that our decision in Knauss focused upon the "future impact" of the break-in-service provision on the actuarial soundness of the Brewery Plan. Appendix at 430. The court then went on to explain that in this case no possibility for solvency existed since the Plan had terminated.
 
 
 64
 43. Our concern for "future impact" in Knauss dealt with the impact on a fund from the viewpoint of the trustees at the time of the adoption of the provision. We remanded for testimony on substantial justification in Knauss because "the trustees suggested ... that, at least at the time that Knauss was denied benefits, the breakin-service clause was necessary to the viability of the Plan.... 583 F.2d at 91 (emphasis added).
 
 
 65
 44. That the attempt on the part of the trustees to preserve the financial security of the Plan was unsuccessful does not compel a finding that no substantial justification existed. The district court creates an impossible predicament for the trustees. If they go too far in attempting to preserve the Plan, their actions may be found to violate § 302; however, if they fail to do enough to preserve the Plan, and the Plan collapses, their actions may be viewed as lacking present justification. We refuse to constrict the trustees in such a fashion.
 
 
 66
 45. In Knauss we expressed concern over the effect of the invalidation of the provision on the remaining beneficiaries of the Plan. The district court in this case again analyzed the "future impact" from the year 1980 instead of 1970, the year in which the provision was adopted. The court noted that "payments to other beneficiaries will not be in any way jeopardized by a judgment in favor of the plaintiff class since the PBGC is statutorily required to pay all nonforfeitable benefits." Appendix at 430.
 
 
 67
 46. In our view, this later-enacted statute does not apply. ERISA provides that benefits are to be paid when nonforfeitable.[31] Nonforfeitability is determined by reference to the underlying brewery plan.[32] Payment of these benefits by the PBGC is a result of a finding that they are nonforfeitable; it is not a cause of such a finding. To hold to the contrary would burden the PBGC with liability for otherwise forfeitable benefits. This is clearly contrary to the explicit language of ERISA.[33]
 
 
 68
 47. The plaintiff class's reliance on two recent Supreme Court decisions is similarly misplaced. In Nachman Corp. v. Pension Benefit Guaranty Corporation, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), the Supreme Court held that promised benefits were nonforfeitable when they were vested but subject to a condition that benefits were limited to the assets of the plan. The condition was struck down by the Court. In Alessi v. Raybestos-Manhattan, 451 U.S. 504, 101 S.Ct. 1895 (1981), the Supreme Court affirmed a decision of this court,[34] allowing the trustees to reduce otherwise vested pension benefits by an amount equal to the state benefits received by the employee.
 
 
 69
 48. These two cases dealt with the question whether a benefit was forfeitable.[35] The plaintiff class reads these cases as holding that benefits such as plaintiffs' are nonforfeitable. The employers read these cases as stating that the benefits are forfeitable in their entirety because the trustees were empowered to reduce benefits under Article VII, Section 2 of the Plan. We reject the first contention and need not reach the second.[36]
 
 
 70
 49. Plaintiff class ignores the explicit language of the cases which it has cited in its brief:
 
 
 71
 (I)f a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually receive(s) it.
 
 
 72
 Alessi, 451 U.S. at 510, 101 S.Ct. at 1899, quoting Nachman, 446 U.S. at 375, 100 S.Ct. at 1733 (emphasis added). Plaintiff class complains that the conditions (that is, the requirements of the partial termination clause) are invalid and need not be met. We find that the conditions are valid and must be met in order for benefits to be nonforfeitable. Plaintiffs have not satisfied these conditions and therefore do not qualify for pension benefits.[37] The numerous cases cited by the plaintiffs are inapposite. While the analysis used by other courts is similar to our own, each case can be distinguished on its facts.[38]
 
 The Liability of the Employers
 
 73
 50. The various claims against the employers were discussed at length by the district court. We find that discussion and analysis to be both complete and correct. Accordingly, we adopt Parts V through VIII of the district court's opinion. 526 F.Supp. 299 (D.N.J.1980).[39]
 
 Grievable Claims Against Budweiser
 
 74
 51. The Michota plaintiffs, claiming that it is not a grievable matter, have sued Budweiser over the latter's refusal to place them on its seniority roster. Failing this, plaintiffs claim that the case should be stayed until this issue has been arbitrated and, alternatively, that the court is required to adjudicate the underlying claims.[40] We do not find either claim persuasive.
 
 
 75
 52. The claim by plaintiffs that this matter was not subsumed within the grievance procedures of the Budweiser collective bargaining agreement was discussed at length by the district court. We summarize the district court's decision and defer to it for a complete analysis of this issue.[41]
 
 
 76
 53. The circumstances surrounding Budweiser's refusal to place these employees on its seniority list have been discussed. It is undisputed that these plaintiffs never submitted this dispute to the grievance procedures provided in the applicable collective bargaining agreement. Appendix at 442. Failure to avail themselves of mandatory grievance provisions leaves the plaintiffs barred from litigating such claims at a later date. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).[42]
 
 
 77
 54. The district court found that a dispute over being placed on a seniority list was clearly a "matter related to wages, hours of work or working conditions under the grievance and arbitration procedures of the 1970-1973 Budweiser collective bargaining agreement." Appendix at 444. Budweiser had adopted a specific interpretation of its collective bargaining agreement in order to determine who would be placed on its seniority list. This clearly "had significance beyond pension rights, impacting on an employee's shift selection, vacations, overtime and recall rights." Id.
 
 
 78
 55. The court supported its position by citing the "well established presumption in favor of the coverage of grievance and arbitration procedures. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)." Appendix at 444. Although this "presumption" is supportive, we are not required to rely on it. The remaining provisions of the grievance procedure (Article IX of the collective bargaining agreement) provide a conclusive ground upon which to rest this decision.
 
 
 79
 56. In addition to requiring grieving of "any matter relating to wages, hours of work or working conditions," Article IX of the Budweiser collective bargaining agreement provides that employees must submit grievances for "any matter involving the interpretation, application or claimed violation of this Agreement." Supplemental Appendix of Anheuser-Busch at 71. The gravamen of plaintiffs' complaint is that Budweiser has failed to comply with its obligations under the agreement. This action by Budweiser resulted from a specific interpretation of the provisions of the agreement. There can be no dispute that this "interpretation" should have been grieved.
 
 
 80
 57. Plaintiffs' contention that the failure to be placed on seniority rosters need not have been grieved in 1973 because no case or controversy existed at that time is similarly without merit. The plaintiffs were required to appear at the Union Hall on a daily basis ("shaping up") in order to obtain work. Appendix at 412. They were given no preferences as to work assignments, overtime or vacation time. In essence they lacked all the typical attributes of seniority. While plaintiffs claim that they had no grievance in 1973, the record evidences that they felt otherwise at the time. Bruno Michota and others complained to their Union that they were not on Budweiser's seniority roster. Supplemental Appendix of Anheuser-Busch at 109-10. The Union required written complaints prior to initiating the grievance mechanism. No written complaints were received, and no grievances were filed. As we have stated, the doctrine of Republic Steel now bars our consideration of these issues.
 
 
 81
 58. Arbitration of these claims at this date is not mandated by our decision in Local 595 v. Howe Sound Co., 350 F.2d 508 (3d Cir. 1965).[43] That case (as well as all others cited by plaintiffs)[44] involved the arbitrability of a dispute between a union and an employer. While the time to grieve that matter had passed, we ordered arbitration. The rationale of our decision in Local 595 was predicated upon an agreement between the parties to solve their disputes by arbitration. The nature of the claim here is quite different. Arbitration is requested by a group of employees. The Union is not a party. The parties in Local 595 v. Howe were a union and an employer. The efficient operation and the success of collective bargaining depends in large part upon the ability of employers to negotiate with a single union rather than a large number of employees:
 
 
 82
 If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.
 
 
 83
 Vaca v. Sipes, 386 U.S. 171, 191-92, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967).
 
 
 84
 59. Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), is in accord. In that case employees submitted grievance claims to their union; the union failed to process these claims. The employees sued the union for a breach of its fiduciary duty of fair representation and sued the employer for a failure to pay wages as provided for under the Fair Labor Standards Act (FLSA).[45] Both the district court and the court of appeals reached only the fair representation issue and found for the defendants.[46]
 
 
 85
 60. The Supreme Court reversed. The Court found that the right to wages under the FLSA was a right which inured to each individual employee. The Court noted the tension between the rights provided under statutes governing employer-union relations and those regulating employer-employee relations. The Court noted that "a dispute over wages and hours, (a) subject at the heart of the collective bargaining process, ... is particularly well suited to resolution through collective bargained grievance and arbitration procedures."[47] The Barrentine plaintiffs' FLSA claims were found to fall outside of this area as they constituted "individual" rights of each employee.
 
 
 86
 61. Seniority, on the other hand, is a "collective" right; it does not exist independently of a collective bargaining agreement as does a minimum wage requirement.[48] While there may be many areas in which employees may be allowed to assert claims directly against an employer, we do not believe that seniority so qualifies. Barrentine, on which plaintiffs rely, explicitly states that "The Labor-Management Relations Act ... was designed ... to improve working conditions by encouraging employees to promote their interests collectively." 450 U.S. at 735, 101 S.Ct. at 1442 (emphasis added). Plaintiffs cite no authority supporting a conclusion that collective action should not be required in this case.
 
 
 87
 62. The Michota plaintiffs' final contention is that ERISA does not require grievance and arbitration prior to litigation. The district court found this claim to be unfounded for several reasons, the primary one being that ERISA was inapplicable since it was enacted after the action complained of-the failure to grant seniority status-occurred. We need not discuss the remaining justifications as this alone adequately disposes of the matter.CONCLUSION
 
 
 88
 63. For all the foregoing reasons, we reverse the district court only so far as it found the actions of the trustees in enacting the partial termination clause to be arbitrary and capricious. We affirm on all other grounds and remand for the reasons stated herein.
 
 
 
 [1]
 Chock Full O'Nuts Corporation (the corporate parent of now-bankrupt defendant Rheingold Breweries, Inc.) and the class action plaintiffs, Bruno Michota, et al., joined in this petition before it was granted
 
 
 [2]
 The Employee Retirement Income Security Act ("ERISA"), §§ 4001-4082, 29 U.S.C. §§ 1301-1381 (1976), establishes a comprehensive plan for the payment of pension funds by a government corporation (PBGC) when the underlying Plan has been terminated
 
 
 [3]
 ERISA § 4022, 29 U.S.C. § 1322 (1976) provides:
 Subject to the limitations contained in subsection (b) of this section, the corporation shall guarantee the payment of all nonforfeitable benefits....
 
 
 [4]
 Hoffman Beverage Company and G. Krueger Brewing Company were also signatory employers. Both withdrew from the Trust. Neither employer is involved in this litigation
 
 
 [5]
 29 U.S.C. § 186(c)(5) (1976). Subject matter jurisdiction pursuant to this statute was challenged below. The district court found that Knauss v. Gorman, 583 F.2d 82 (3d Cir. 1978), was controlling and jurisdiction existed. 526 F.Supp. 299, at 309 (D.N.J.1980). We agree
 
 
 [6]
 Article III, § 3.1; Appendix at 15. Article IV, § 4.9 gives each group of trustees, both union and employer, one vote. Appendix at 21
 
 
 [7]
 Article VIII, § 8.3 provides:
 Neither this Trust nor the Pension Plan imposes any obligation on any Employer to make any payments to the Fund; any such obligations are, as to Employers, derived solely from whatever provisions there may be in the Collective Bargaining Agreement from time to time, and, as to Unions, derived solely from their undertaking to make contributions pursuant to Paragraph 1.2 hereof.
 Appendix at 27.
 
 
 [8]
 Article V, § 5.1 provides:
 Each employer shall pay to the Trustees the Employer contributions required of it by the current and effective Collective Bargaining Agreement, and in the manner and at the time required thereby.
 Appendix at 24.
 
 
 [9]
 Article VI, § 6.1 provides:
 An Employer shall cease to be an Employer under this Agreement whenever either:
 (a) his obligation to the Trust Fund is no longer required by a Collective Bargaining Agreement, or
 (b) he no longer employs any employees, or
 (c) he has failed to make any contributions to the Trust Fund for a total of three consecutive months....
 Appendix at 24.
 Article VI, § 6.2 provides:
 When, as provided in Section 6.1, an employer ceases to be an employer hereunder:
 (b) Such employer shall have no further rights, obligations or powers under this Trust Agreement except as hereinafter in this Article VI provided.
 Appendix at 25. The district court rightly characterized the minor exceptions referred to in subsection (b) as irrelevant. Appendix at 406.
 
 
 [10]
 This unfunded accrued liability exceeded $50,000,000 by 1970. Appendix at 253
 
 
 [11]
 The actual text of Article VII is as follows:
 Section 1. Notwithstanding any other provision of the Plan to the contrary if an Employer ceases to be an Employer ... all of the Credited Service of its then employees (including its former employees who terminated employment with such Employer within the three month period immediately preceding the date on which such Employer ceased to be an Employer) shall be cancelled except for the following employees of the ceased Employer : (a) those Employees who have completed thirty (30) years or more of Credited Service; (b) those Employees who have both completed at least ten (10) years of Credited Service and attained age 65; (c) those Employees who have both completed at least fifteen (15) years of Credited Service and attained age 60; (d) those Employees who have completed at least ten (10) years of Credited Service with one or more of the Employers who is remaining as an Employer under the Plan; and (e) those Employees who are placed on the regular employees seniority list of a remaining Employer and accumulate enough Covered Days with such remaining Employer during the one year period commencing on and immediately following the date their Employer ceased to be an Employer to earn at least one-fifth (1/5) of a year of Credited Service, excluding for the purpose of this determination all Covered Days with their Employer who ceased to be an Employer and assuming, for the purpose of this determination, that the Covered Days with a remaining single Employer all were earned during one Plan Year.
 The term employees as used in this Section 1 shall mean persons covered by the current Collective Bargaining Agreement between the Employers and the Unions.
 Section 2. If an Employer ceases to be an Employer as defined herein, the Trustees shall instruct the actuary for the Plan to conduct a valuation of the Plan as of the date such Employer ceased to be an Employer, taking into consideration the total funds available and the actuarial liabilities for benefits accrued by all Employees based on the Credited Service in effect after the cancellation of Credited Service as defined in Section 1 of this Article VII. Based upon the results of this valuation, the monthly retirement pension payable in accordance with the provisions of Article II, Article III, Article IX and Article X shall be reduced for all eligible Employees who make application for pension on or after the date such Employer ceased to be an Employer and for all Employees who made application for retirement within the three month period immediately preceding the date on which such Employer ceased to be an Employer. The reduction in the monthly retirement pension payable referred to in the preceding sentence shall apply uniformly to all Credited Service in effect after the cancellation of Credited Service as defined in Section 1 of this Article VII. This reduction in monthly retirement pensions shall be determined by the actuary of the Plan in such a manner that the rate at which the unfunded accrued liability was being funded according to the actuarial valuation on the July 31 preceding the date such Employer ceased to be an Employer shall be estimated to continue to be the rate at which the unfunded accrued liability is being funded on the day after such Employer ceased to be an Employer.
 Appendix at 409-10 (emphasis added).
 
 
 [12]
 The 1972 amendment to Article VII, Section 1 provided that credited service of the following employees would not be cancelled:
 (e) those Employees who are employed by another single Employer under this Plan and accumulate enough Covered Days with such other single Employer during the one year period commencing on and immediately following the date that their original Employer ceased to be an Employer who have earned at least one-fifth (1/5) of a year of Credited Service, excluding for the purpose of this determination, all Covered Days with their original Employer who ceased to be an Employer and assuming for the purpose of this determination, that the Covered Days with the other single Employer all were earned during one Plan Year.
 Appendix at 111.
 
 
 [13]
 Article IX of the collective bargaining agreement provided:
 ARTICLE IX
 GRIEVANCE PROCEDURE
 
 
 [9]
 1 A grievance within the meaning of the grievance procedure shall be defined as any difference between the Company and the employees covered by this Agreement or between the Company and the Union or the Local designated by the Union as to: (a) any matter relating to wages, hours of work or working conditions covered by this Agreement, and (b) any matter involving the interpretation, application or claimed violation of this Agreement. Both the Company and the Union or the Local designated by the Union and the employees must resort to the use of the established grievance procedure as hereinafter provided. Such grievances may be instituted by either the Company or the Union or the Local designated by the Union or the employee through any of the appropriate steps provided for in the grievance procedure preceding arbitration
 Supplemental Appendix of Anheuser-Busch at 71. Plaintiffs believe that their claims are not covered by the grievance procedure and that they are free to raise them in this action.
 
 
 [14]
 ERISA §§ 4042(c), 4048(1), 29 U.S.C. §§ 1342(c), 1348(1) (1976)
 
 
 [15]
 The PBGC ascertained "that it was unable to determine that the assets of the Plan" would allow for the payment of all "nonforfeitable" benefits when allocated in accordance with ERISA. Appendix at 411 n.5. ERISA requires the PBGC to guarantee payment of "nonforfeitable" pension benefits. ERISA §§ 4022(a), 4041(c), 29 U.S.C. §§ 1322(a), 1341(c) (1976). Where nonforfeitable benefits are unfunded, the PBGC can make claims against the former contributing employers. ERISA §§ 4082, 4211, 4212, 29 U.S.C. §§ 1381, 1391, 1392 (1976). Claims between the PBGC and the former employers remain to be tried below
 
 
 [16]
 The definition of the plaintiff class was refined by the district court in its order of December 29, 1980 to include all individuals employed by Ballantine with ten or more years of service on April 1, 1972, and whose service credit was eliminated by the partial termination clause in the Brewery Plan. Appendix at 458
 
 
 [17]
 Appendix at 462
 
 
 [18]
 29 U.S.C. §§ 141-187 (1976)
 
 
 [19]
 29 U.S.C. § 186 (1976)
 
 
 [20]
 29 U.S.C. § 186(c)(5) (1976)
 
 
 [21]
 LMRA, § 302(e), 29 U.S.C. § 186(e) (1976). An allegation of a "structural violation" is sufficient to vest the court with jurisdiction. NEDD v. UMV, 556 F.2d 190, 201 n.18 (3d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978)
 
 
 [22]
 Other courts have asserted that an arbitrary break-in-service rule is violative of § 302(e). See, e.g., Riley v. MEBA Pension Trust, 570 F.2d 406 (2d Cir. 1977); Wilson v. Board of Trustees, 564 F.2d 1299 (9th Cir. 1977); Local No. 5 v. Mahoning and Trumbull County Trades Welfare Fund, 541 F.2d 636 (6th Cir. 1976); Johnson v. Botica, 537 F.2d 930 (7th Cir. 1976)
 
 
 [23]
 See, e.g., Mosley v. National Maritime Union & Welfare Plan, 451 F.Supp. 226 (E.D.N.Y.1978)
 
 
 [24]
 This problem has been explicitly recognized by other courts. See, e.g., Roark v. Lewis, 401 F.2d 425, 429 (D.C.Cir.1968)
 
 
 [25]
 See Roark v. Lewis, 401 F.2d 425 (D.C.Cir.1968)
 
 
 [26]
 As noted by the district court, Article X, Section 2 was never repealed by the trustees. Appendix at 410
 
 
 [27]
 It is argued that the choosing of a ninety day period is arbitrary and capricious. We disagree. As the District of Columbia Circuit has noted: "(B) y their very nature most eligibility requirements ... are colored to greater or lesser degree by an element of arbitrariness." Roark v. Lewis, 401 F.2d 425, 428 (D.C.Cir.1968)
 
 
 [28]
 Additional liabilities are not automatically incurred for these workers since, although contributions are made on their behalf, for various reasons many of them may not ultimately become eligible for pension benefits
 
 
 [29]
 Knauss, 583 F.2d at 89
 
 
 [30]
 Id
 
 
 [31]
 ERISA § 4022, 29 U.S.C. § 1322 (1976)
 
 
 [32]
 ERISA § 3; 29 U.S.C. § 1002 (1976)
 
 
 [33]
 The statute requires benefits to be nonforfeitable as a condition of PBGC liability. ERISA § 4022, 29 U.S.C. § 1322 (1976)
 
 
 [34]
 See, Buczynski v. General Motors Corp., 616 F.2d 1238 (3d Cir. 1980)
 
 
 [35]
 Nachman, 446 U.S. at 371, 100 S.Ct. at 1731; Alessi, 451 U.S. at 511-512, 101 S.Ct. at 1900
 
 
 [36]
 Appellant Chock Full O'Nuts argues that the power of the trustees to reduce benefits makes these benefits conditional and therefore forfeitable under the test of Nachman and the explicit language of ERISA (benefits must be unconditional and legally enforceable against the Plan. 446 U.S. at 375, 100 S.Ct. at 1733, ERISA § 3, 29 U.S.C. 1002 (1976)). As we have decided that the enactment of the partial termination clause was a valid exercise of the trustees' power and as the plaintiff class has not contested the actions of the trustees in reducing the amount of benefits payable to all beneficiaries under Article VII, Section 2, we reserve opinion as to whether these benefits would in all instances be considered forfeitable
 
 
 [37]
 We reiterate that we express no opinion as to whether Article VII, Section 1 should be invalidated because of the lack of notice given the beneficiaries of its enactment. This is a matter of dispute between the parties and is not properly before this court. As the district court noted, summary judgment would have been denied had this been the sole basis of the alleged invalidity of Article VII. Appendix at 434 n.20
 
 
 [38]
 See, e.g., Pierce v. NECA-IBEW Welfare Trust Fund, 620 F.2d 589 (6th Cir.), cert. denied, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980), holding that the trustees of a multi-employer trust fund did not act arbitrarily and capriciously in reducing the benefits payable to employees of employers who have withdrawn from the Plan; Bridge, Structural and Iron Workers Local 111 v. Douglas, 646 F.2d 1211 (7th Cir.) cert. denied, --- U.S. ----, 102 S.Ct. 328, 70 L.Ed.2d 166, holding that the trustees of a multi-employer trust fund did not act arbitrarily and capriciously in enacting an amendment to a plan which required employees of a withdrawn employer to meet various conditions before they would qualify for otherwise vested pension benefits. The court noted that there was an unfunded liability of $400,000 prior to the Plan amendment. In its discussion the court found that the trustees adopted the amendment to avert financial impairment of the trust fund. This was considered to be within their discretion as fiduciaries. The Ninth Circuit cases cited by the plaintiff class are less clearly on point. In Lee v. Nesbitt, 453 F.2d 1309 (9th Cir. 1972), the court remanded for a determination under § 302 of ERISA, 29 U.S.C. § 186 (1964), as to whether the plaintiff's break in service was voluntary or involuntary. Plaintiff had claimed that no employment was available. Defendants offered no substantial justification for the enactment of the provision. In Burroughs v. Board of Trustees of Pension Trust, 542 F.2d 1128 (9th Cir. 1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977), the court held that it was unfair to apply a break-in-service provision to an employee who did not have notice of its existence. As noted above, this question is not now before us
 Numerous cases by the District of Columbia Circuit Court of Appeals have been cited. Robinson v. United Mine Workers, 640 F.2d 416 (D.C.Cir.), cert. granted, --- U.S. ----, 102 S.Ct. 89, 70 L.Ed.2d 82; Norton v. I. A. M. National Pension Fund, 553 F.2d 1352 (D.C.Cir.1970); Roark v. Lewis, 401 F.2d 425 (D.C.Cir.1968). Each of these cases can be clearly distinguished from the case at hand, and none contravenes our analysis.
 
 
 [39]
 Plaintiffs, in a recent submission to this court, ask us to review the instant case in light of our decision in Aldernay Dairy Company, Inc. v. Hawthorn Mellody, Inc., 643 F.2d 113 (3d Cir. 1981). We find nothing in our decision in Aldernay which would alter our analysis in this case
 
 
 [40]
 See Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981)
 
 
 [41]
 526 F.Supp. 299, at 318-322 (D.N.J.1981)
 
 
 [42]
 Various exceptions to this doctrine have been established. See, e.g., Barrentine v. Arkansas-Best Freight Systems, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); Clayton v. Int'l Union, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)
 
 
 [43]
 The Michota plaintiffs claim that this matter should be stayed pending arbitration. This claim is raised for the first time on appeal
 
 
 [44]
 See, e.g., Swartz & Funston v. Local 7, 319 F.2d 116 (3d Cir. 1963); L.O. Koven & Brother v. Local 5767, 381 F.2d 196 (3d Cir. 1967); Blake Construction v. Laborers' Int'l, 511 F.2d 324 (D.C.Cir.1975)
 
 
 [45]
 29 U.S.C. §§ 201-219 (1976)
 
 
 [46]
 See Barrentine, 450 U.S. at 728, 101 S.Ct. at 1440
 
 
 [47]
 450 U.S. at 735, 101 S.Ct. at 1442
 
 
 [48]
 See United Steelworkers of America v. Crane Co., 605 F.2d 714 (3d Cir. 1979)